# EXHIBIT A

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | | |
|---|---|---|
| | § | |
| | § | |
| LYNNE HOUSERMAN, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | No. 2:19-cv-00644-RAJ-BAT |
| | § | |
| | § | |
| | § | |
| | § | |
| COMTECH TELECOMMUNICATIONS | § | |
| CORPORATION, FRED KORNBERG AND | | |
| MICHAEL D. PORCELAIN, | § | |
| Defendants. | § | |
| | § | |
| | § | |

## EXPERT REPORT OF GARY B. GOOLSBY
### August 14, 2020

CONFIDENTIAL

## *Table of Contents*

**Nature of Involvement** ...................................................................................................... **2**

**Qualifications and Experience** ............................................................................................ **2**

**Information Considered** ....................................................................................................... **5**

**Executive Summary** .............................................................................................................. **5**

**Relevant Background Considered in My Analysis** ............................................................ **8**

*Background* ................................................................................................................................. 8

*Standards for Governance and Internal Controls* ................................................................ 12

*Internal Control Framework* .................................................................................................. 13

*Components of Effective Internal Control* ............................................................................. 15

*Accrual Accounting and Estimates* ....................................................................................... 19

**My Opinions and Analysis** ................................................................................................ **20**

*The calculations and presentations of pre-tax profit bonus goals reflected in the Goal Sheets for Fiscal 2017 and Fiscal 2018, respectively, were fraught with error, illogical expectations and a lack of knowledge by Comtech executive management as to how they were derived and managed. Furthermore, Houserman's approach to dealing with these issues was appropriate, from an auditing and accounting perspective, and not an override of internal controls.* .................................................. 20

*Comtech executive management incorrectly concluded that Houserman overrode internal controls and failed to factor in the full disclosures made by Houserman, unresolved calculations and dialogue that was confusing and lacking timeliness. Furthermore, Comtech relied upon the conclusions of Eichberger's investigation, which was not appropriate, given Eichberger did not conclude on override of internal controls.* ............................................................................................................................. 41

*Comtech uniquely identified the alleged override of internal controls by Houserman as a Significant Deficiency which was overreaching given the dysfunction of Comtech's executive management in dealing with Houserman's questions, multitude of historical Deficiencies at Comtech and absence of evidence of any other SST internal control issues involving Houserman.* ................................ 48

*Comtech attempted to push the harsh action taken against Houserman to Deloitte by ascribing the identification of the alleged overriding of internal controls and Significant Deficiency to Deloitte when, in fact, such identification was that of Comtech and Deloitte, as expected under auditing protocol, accepted the decision.* .................................................................................................................. 52

*In my opinion, Houserman's actions did not warrant a conclusion that she overrode internal controls of Comtech. Houserman's actions were entirely appropriate and part of a healthy internal controls process calling for top management timely dialogue to ultimate resolution rather than an unfounded, knee jerk reaction by Comtech executive management given the confusion, errors, lack of understanding and timely candor demonstrated by such management.* .......................................... 55

**Right to Update and Supplement** ..................................................................................... **55**

Appendix 1 – Curriculum Vitae

Appendix 2 – Information Considered

CONFIDENTIAL

*Nature of Involvement*

1.  I have been retained by Calfo Eakes LLP ("Counsel") in their representation of Lynne Houserman ("Houserman") in this matter.

2.  I was asked to provide an independent assessment of the conclusion of Comtech Telecommunications Corporation ("Comtech"), Fred Kornberg ("Kornberg") and Michael D. Porcelain ("Porcelain") that Houserman, among other alleged actions, allegedly overrode and violated Comtech policies and procedures and thereby created a Significant Deficiency in Comtech's internal controls relating to the accrual for her bonus for the year ended July 31, 2018 ("Fiscal 2018"), which resulted in her termination of employment with Comtech effective April 18, 2018.  When discussing the allegation of overriding internal controls in this report, the reference is to the alleged overriding of Comtech's internal controls for accruing bonus based on pre-tax profit included in Comtech's Safety and Technologies subsidiary ("SST") Goal Sheet for Houserman for Fiscal 2018, as defined.

*Qualifications and Experience*

3.  My professional experience is based on over 46 years in accounting and auditing, risk management, expert consulting and testifying regarding investigations, accounting standards, governance, internal controls and business processes, board of directors and regulatory interactions, executive management, expert witness testimony, case consultancy and technical presentations.  My experience relates to work I have conducted or supervised in the United States and other international locations.

CONFIDENTIAL

4.     I have served as an expert on various of these matters during my career including, among others, accounting, auditing, internal controls, governance, insolvency, fraudulent transfers, asset tracing (including cash and oil), post-acquisition disputes and investigative matters in numerous legal and regulatory venues, including: United States Federal Courts; United States Court before an Administrative Law Judge of the United States Securities and Exchange Commission ("SEC"); State Courts in the United States; United States and international arbitrations; and presentations of results of forensic investigations to the SEC, Department of Justice and Office of Foreign Assets Control.

5.     I am a Certified Public Accountant licensed in Texas and Louisiana.  I am a graduate of Louisiana Tech University in Ruston, Louisiana with Bachelor of Science and Master of Business Administration degrees. My professional experience has spanned many industries in the United States and internationally including information technology, healthcare, investment companies, financial institutions, pulp and paper, construction, engineering, oil and gas, mining and real estate. My career includes 28 years (18 as an audit and leadership partner) with Arthur Andersen, where, in addition to signing audit opinions, I held many leadership positions over several years, including, among others, (a) Managing Partner – Global Risk Management for the worldwide firm, (b) Managing Partner of Practice Directors (risk management) for Global Audit and Business Advisory Practice and (c) Chairman of Global Risk Management Executive Committee.

6.     I also served as a Practice Director for the Financial Markets Industry for Arthur Andersen and signed opinions on audits of financial institutions including during the

CONFIDENTIAL

        high-risk banking and savings and loan crisis period in the 1980s. I also consulted as a Practice Director on a wide range of accounting and auditing issues including, among others, weaknesses in and overrides of internal controls, restatements of financial statements, related party transactions, fraudulent transactions, purchase accounting, structuring of acquisitions, liquidity, type of audit report to be issued and integrity of management. My consultation covered issues in several industries, assisted with enhancements to audit methodology based on changing business and industry conditions, evaluated and disciplined partners for performance issues, supervised the audit practice review program, and conducted numerous accounting and auditing training sessions, among many other responsibilities.

7.     I also have courtroom and arbitration-recognized expertise and experience in the application of Generally Accepted Accounting Principles ("GAAP") (in numerous countries), International Financial Reporting Standards, and in the application of auditing standards that are generally accepted throughout the global financial reporting community. Furthermore, I have extensive experience in developing financial information through forensic investigations and in the use of such information by companies' managements in adjusting their companies' financial statements. I have significant experience in evaluating investigative information presented by managements for potential restatements and auditing such restatements. Critical to those evaluations is my decades-long experience in concluding on what is considered to be appropriate documents supporting restatement adjustments.

8.     Attached as Appendix 1 is my curriculum vitae.

CONFIDENTIAL

9.  I am being compensated for my involvement in this matter based upon our standard hourly billing rates of $750 an hour.  My fee is not contingent upon my opinions reached or the outcome of this matter.  My opinions in this matter are based upon my judgment and expertise in accounting and auditing, among other areas as noted above, and my analysis of the information provided to and collected by FTI.  FTI is being compensated for time incurred by other professionals who have supported my analysis in this matter at various billing rates.

10.  This report should not be construed to constitute or contain opinions on matters of law, nor as an audit or any other type of attestation opinion.  This report is confidential and should not be disclosed or referred to in whole or in part outside of this proceeding without my prior written consent.

## Information Considered

11.   I have considered the documents, witness testimony and other information as described in Appendix 2 in forming my opinions in this matter.  This report is based on information available as of the date of the report.  Upon review of any additional relevant information that may become available, I reserve the right to amend or supplement my findings or opinions set forth in this report.

## Executive Summary

12.  In my opinion, the allegation that Houserman overrode internal controls during Fiscal 2018 relating to the accrual of her bonus as President of SST leading to her termination, was clearly not supported by the facts and circumstances and has no foundation based on my extensive, independent assessment of the evidence presented and my 46 years

5

CONFIDENTIAL

of experience. *Simply put, Houserman did not override internal controls relating to her bonus accrual and termination for such was not appropriate.*

13. Houserman's actions were consistent with the guidelines and expectations pursuant to the rules for accrual accounting and the internal control over financial reporting ("ICFR") requirements of Sarbanes Oxley ("SOX") under the securities acts relating to public companies like Comtech. *Houserman, in my view, made appropriate decisions and took appropriate actions from an accounting and auditing perspective* in dealing with the uncertainty during the first six months of Fiscal 2018 of how to properly accrue for her Fiscal 2018 bonus, given that her measurement of achievement included what she reasonably believed to be erroneous negative adjustment of $6.297 million to actual pre-tax profit. Consistent with accrual accounting guidelines and internal controls under ICFR, Houserman questioned the appropriateness of the $6.297 million negative adjustment, which she believed to be an error in the calculation and called for its correction.

14. Consistent with GAAP and proper internal controls, she provided direction to SST's Vice President, Finance, Jason Christensen ("Christensen") to accrue for her and the SST division's Fiscal 2018 bonuses excluding the deduction for the reasons noted below. Houserman served as President of SST, not an accountant, and relied on Christensen to maintain accurate books and records consistent with the proper accounting and internal control guidelines, which he did, considering the needed accuracy in excluding the negative adjustment and unresolved nature of the issue.

15. Houserman's concern and actions regarding the negative adjustment being an error were legitimate given the absence of adjustment documentation, no timely

CONFIDENTIAL

communication from Comtech executive management for several months regarding the potential error, illogical nature of the adjustment as applied in Fiscal 2018, and confusion relating to the adjustment's history for the year ended July 31, 2017 ("Fiscal 2017"). As soon as Houserman discovered the questionable adjustment, she communicated with Kornberg, CEO, who signed the Fiscal 2018 Goal Sheet, noting the error and requesting resolution. Houserman followed up with Kornberg on multiple occasions. Houserman also fully disclosed the issue in the quarterly sub-certifications regarding compliance with ICFR submitted to Comtech corporate accounting for the first and second quarters of Fiscal 2018 that she and Christensen executed. Nevertheless, Houserman did not receive a timely response from Kornberg or Comtech management about the error.

16. I reviewed the extensive record and testimony relating to Houserman's actions relating to the accrual ignoring the negative adjustment and have concluded that she was put in an impossible situation by Comtech executive management's failure to respond promptly to her question regarding the apparent error. In order to comply with the internal controls relating to recording of proper estimation of accruals on a monthly basis, Houserman did what any prudent executive would do and recorded what she deemed to be the correct estimate, setting aside the negative adjustment, given Comtech is a public company with quarterly reporting requirements. She then disclosed such action in the quarterly sub-certification, a best practice from an auditing and accounting perspective.

17. Comtech, not Deloitte & Touche LLP ("Deloitte") or PricewaterhouseCoopers LLP ("PwC"), concluded that what Houserman did when allegedly overriding internal

CONFIDENTIAL

controls was a Significant Deficiency in ICFR.  Based on my decades of auditing and accounting experience, I disagree with Comtech's conclusion.

18.  Likewise, I note that John Sarno ("Sarno"), Deloitte engagement partner on the Comtech audit, testified that, given the unresolved nature of the negative adjustment, what Houserman did should not even be a Deficiency in ICFR—let alone a *Significant* Deficiency.  I agree with Sarno.  Sarno also testified that accruals should be recorded based on what is deemed to be the correct information, consistent with ICFR, which is what Houserman directed Christensen to do here.  I also agree with Sarno in that regard.

19.  In my opinion, Houserman complied with ICFR and did what I would expect any executive to do under the circumstances in order to reflect in the accounting records proper accruals, adjusting for questionable items, pursuant to the accounting and internal control guidelines, including discussing and coordinating with Christensen, her top accounting leader for SST, and raising the issue repeatedly to Comtech management.

*Relevant Background Considered in My Analysis*

*Background*

20.  Comtech is a provider of advanced communication solutions for both commercial and government customers worldwide.[1]  Houserman entered into an employment agreement on February 27, 2016 as President of SST ("2016 Comtech Agreement") subsequent to Comtech's acquisition of TeleCommunications Systems, Inc. ("TCS").  The 2016 Comtech Agreement contained, among others, provisions relating to (i)

---

[1] Comtech Telecommunications Corporation, July 31, 2019 Form 10-K, at 1.

CONFIDENTIAL

compensation, (ii) bonus plan and structure (utilizing Comtech's Goal Sheets), (iii) stock compensation, (iv) benefits and (v) reporting structure.[2]

21.   Beginning April 27, 2016 through August 13, 2016, Houserman was on maternity leave.[3]  While on maternity leave, she was notified that the Call Handling product line for which SST had been responsible would be moved to another subsidiary led by Jay Whitehurst ("Whitehurst") effective August 1, 2016.[4]

22.   Subsequent to its transfer, a $6.297 million loss was projected relating to the Call Handling product line for Fiscal 2017.  Thus, Houserman's Fiscal 2017 Goal Sheet reflected a reduction of $6.297 million, representing the estimated Fiscal 2017 loss for the Call Handling product line, in calculating her actual pre-tax profit for purposes of calculating her bonus achievement against SST's goals as established by Comtech's Executive Compensation Committee.[5]  There was not any agreement regarding the application of a similar reduction for the Goal Sheet for Fiscal 2018 or beyond.[6]

23.   In addition, the pre-tax profit goal reflected on the Fiscal 2017 Goal Sheet included a reduction of $6 million representing a rounded amount deduction for the $6.297 million estimated loss for the Call Handling product line for Fiscal 2017 which effectively offset the deduction from the actual pre-tax profit for Fiscal 2017.[7]

---

[2] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 2.
[3] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 3.
[4] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 3; Eichberger00014-00015.
[5] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 3.
[6] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 4.
[7] Eichberger000604-000606.

CONFIDENTIAL

24.     In September 2017, Houserman received her Fiscal 2018 Goal Sheet which she signed and returned in October 2017.  Prior to signing her Fiscal 2018 Goal Sheet, Comtech did not discuss with Houserman any continued application of the $6.297 million adjustment in Fiscal 2018.  When signing that Goal Sheet, Houserman did not notice that it included another $6.297 million reduction from SST's actual pre-tax profit achievement which she later in early November 2017 noticed and suspected to be an error.[8]

25.     In early November 2017, when working with Christensen on the accruals for Fiscal 2018, he alerted her to the fact that the goal sheet contained the same reduction as from Fiscal 2017.[9]

26.     Neither the previous nor current CEO had indicated that the $6.297 million reduction would be applied over multiple years, and, based on her emails to Comtech's CEO in November 2017, Houserman apparently believed that the inclusion of the reduction in Fiscal 2018 was an error.  To resolve the apparent error, she reached out to the CEO, Kornberg, alerting him of the apparent error.  She requested, beginning in November 2017, that the Vice President, Finance (Christensen), who did not disagree, accrue for the bonus based on what she believed to be the correct amount (i.e., excluding the $6.297 million deduction).[10]  The issue went unresolved for three months, despite attempts by Houserman to resolve with Kornberg.

---

[8] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 5.
[9] TSYS070730-070731; TSYS070740-070741.
[10] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 5, 7.

CONFIDENTIAL

27.   Houserman fully disclosed the apparent error in the first and second quarter of Fiscal 2018 Quarterly Financial and Disclosure Consideration Checklists ("Quarterly Checklist") and noted the needed resolution in her President's reports for SST issued to Comtech corporate executive management in December 2017 and January 2018.[11]

28.   When Comtech's CFO, Porcelain, finally informed Ms. Houserman in February 2018 that he did not believe the $6.297 million adjustment to be an error on the Fiscal 2018 Goal Sheet, Houserman complained that the company was treating her bonus differently than it was treating the other Presidents' (all males) bonuses.   Porcelain responded by telling Houserman to be "careful what [she] wish[ed] for."[12]

29.   Comtech's Audit Committee met on March 6, 2018 to discuss, among other topics, the alleged override of internal controls by Houserman which was deemed by the Committee to be a Significant Deficiency in internal controls.  The Audit Committee agreed to terminate Houserman at such meeting as a result of the alleged override of internal controls.  Various members of Comtech management attended the meeting, including Kornberg and Porcelain, as well as representatives of Deloitte, independent auditors for Comtech, and PwC, Internal Audit team[13] for Comtech.[14]

30.   Comtech engaged the law firm Proskauer Rose LLP ("Proskauer") on March 18, 2018 to conduct an investigation in response to those complaints of gender discrimination and retaliation made by Houserman with respect to her Fiscal 2018 Goal Sheet.  Nicole

---

[11] TSYS024643; John Sarno Deposition, July 22, 2020, Exhibit 17A; Fred Kornberg Deposition, July 30, 2020, Exhibits 11A and 12A.
[12] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 7, 8.
[13] Tricia Sheehan Deposition (Rough Draft Transcript), August 13, 2020, at 9-10.
[14] TSYS000757; TSYS025148.

CONFIDENTIAL

> A. Eichberger ("Eichberger"), partner with Proskauer, conducted the investigation and issued her report on March 28, 2018.[15]

31.   On April 2, 2018, Comtech terminated Houserman for cause, citing willful violation of material Comtech policies and procedures and overriding Comtech's established financial reporting processes relating to the accrual of SST bonus amounts excluding the $6.297 million amount.[16]

*Standards for Governance and Internal Controls*

32.   Strong governance and an effective system of internal control (including control over compliance with laws and regulations) is the foundation for every company, regardless of size or complexity.  The success or failure of a company can be driven by the strength or weakness of its system of internal control.  All internal control activities, to be effective, should be fully integrated in the company and embedded in operational activities to ensure seamless execution.

33.   Appropriate internal controls vary by company, depending on factors such as its size, nature and location of operations and risk.  Internal control must be judged as an entire system, instead of control by control; weaknesses in one area of a company's controls may be overcome by strengths in other areas.  Determining the overall effectiveness of a system of internal control is judgmental, guided by standards such as those discussed below.  Ultimately, though, the stronger and more effective a system of internal control is, the more management can rely on those internal controls in the day-to-day operation of the entity.

---

[15] Eichberger00010-00018; https://www.proskauer.com/professionals/nicole-eichberger.
[16] TSYS038822.

CONFIDENTIAL

34.    While internal controls are the responsibility of all employees, senior management plays a significant role.  Finance and accounting officers have responsibilities regarding documenting and executing certain processes, while all of management has supervisory responsibility for the proper execution of controls by their teams, and identification and mitigation of risks.  Management must also establish a strong culture with a positive "tone at the top."  Internal Audit groups are primarily responsible for evaluating the effectiveness of the controls, including compliance with documented policies and procedures.  The entity's Board of Directors and its Audit Committee have oversight responsibility and should receive regular reporting by both internal and external auditors regarding the effectiveness of the entity's controls, as well as act proactively to address new risks.

35.    No system of internal control is perfect.  There are always areas requiring improvement or enhancement, whether due to identification of weaknesses or recognition of new best practices.  It is expected that management will react to resolve the issue or incorporate the new practice.  This requires a continuous process of evaluating the system of internal control.

### Internal Control Framework

36.    The accepted criteria for establishing internal control and evaluating its effectiveness were established by COSO in 1992, amended in 1994 and updated in 2013.[17]  COSO

---

[17] Internal Control—Integrated Framework issued by Committee of Sponsoring Organizations of the Treadway Commission (September 1992, amended May 1994) ("COSO"), at 96-97.  The National Commission on Fraudulent Financial Reporting ("Treadway Commission") was created in 1985 by the joint sponsorship of the American Institute of Certified Public Accountants, American Accounting Association, Financial Executives Institute, Institute of Internal Auditors and Institute of Management Accountants.  The major objective of the Treadway Commission was to identify the causal factors of fraudulent financial reporting and to make recommendations to reduce its incidence.  A resulting study was conducted under the auspices of COSO to provide criteria for establishing internal

CONFIDENTIAL

defines internal control as a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:

- Effectiveness and efficiency of operations.

- Reliability of financial reporting.

- Compliance with applicable laws and regulations.[18]

37.     The three categories of controls are distinct, yet overlapping, and address different aspects of a company's business.  For the purposes of my analysis, which is focused on the ICFR, the key attributes of effective internal control include: (1) An effective system of internal control is a process, not a singular control; (2) internal control is implemented by people; and (3) effective internal control must only provide *reasonable assurance* of the reliability of a company's financial reporting or compliance with laws and regulations—not absolute assurance against problems.[19]

38.     SOX and related SEC requirements call for senior management of public companies like Comtech to publicly certify to the effectiveness of the company's ICFR, based on management's own assessment of that system of controls.  External auditors like Deloitte, independent auditors for Comtech, are then required to issue opinions in their public audit reports regarding the auditor's *own* opinion on the effectiveness of the company's ICFR (as well as the auditor's opinion on management's assessment of

---

control and evaluating its effectiveness for use by management, internal and external auditors, educators and regulatory bodies, resulting in the Internal Control—Integrated Framework.  In 2013, COSO updated the Internal Control – Integrated Framework to help organizations design and implement internal control in light of changes in the operating and business environments since1994. Internal Control—Integrated Framework issued by Committee of Sponsoring Organizations of the Treadway Commission (May 2013).

[18] *Id.,* at 13.

[19] *Id.,* at 3, 13.

CONFIDENTIAL

those controls).[20]   The SEC adopted COSO as the framework for evaluating the effectiveness of ICFR under SOX.[21]  For the purposes of my analysis, then, I will focus on the COSO criteria for evaluating effectiveness of internal controls.

39.     The effectiveness of a company's ICFR is determined by management through performing reviews, assessments, testing and analysis of the various internal controls throughout the organization.  A key process performed by many companies is receiving sub-certifications from various members of management, including presidents, CFOs and controllers,[22] in different operations of the companies, such as divisions and subsidiaries, covering the effectiveness of ICFR for their respective area.  The sub-certifications are accumulated by the company's executive management in order to assess for the certification of effectiveness of ICFR by the CEO and CFO included in Form 10-K filed with the SEC.[23]  The sub-certification process was used by Comtech for its various subsidiaries on a quarterly basis with the form being signed by the President and Vice President, Finance and forwarded to the corporate finance and accounting group.[24]

### *Components of Effective Internal Control*

40.     According to COSO, effective internal control can be evaluated through looking at five overlapping concepts:[25]

---

[20] SEC Release No. Rel.T.33-8238.I.; Comtech Telecommunications Corporation, July 31, 2017 Form 10-K, at F-2, F-3. Exhibit 31.1, Exhibit 31.2, Exhibit 32.1, Exhibit 32.2.; Comtech Telecommunications Corporation, July 31, 2018 Form 10-K, at F-2, F-3. Exhibit 31.1, Exhibit 31.2, Exhibit 32.1, Exhibit 32.2.
[21] SEC Release No. Rel.T.33-8238.II.A-B.
[22] Survey of Sub-Certifications;  http://scsgp.informz.net/SCSGP/data/images/Alert%20Documents/Summary%20-%20SOX%20302%20Sub-Certification%20Practices.pdf.
[23] Deloitte, Refocus your certification programs lens. How to unlock hidden value, copyright 2020.
[24] Tricia Sheehan Deposition (Rough Draft Transcript), August 13, 2020, at 30-31.
[25] Internal Control—Integrated Framework, at 4-5, 16, 18, 23-32, 33-48, 49-57, 59-67, 69-78.

CONFIDENTIAL

41.   **Effective Control Environment.**  Management needs to set the right "tone at the top," or attitude, in the organization, by providing strong, thoughtful, ethical, diligent leadership that motivates employees throughout the organization to do the right thing. The organization should be structured to provide a framework within which activities for achieving company-wide objectives are planned, executed, controlled, and monitored.  Key management committees should be established to evaluate and analyze operating and financial reporting decisions, and a company's Audit Committee should focus on risk areas and adherence to codes of conduct.

42.   **Effective Risk Assessment.**  Management needs to establish and implement processes to identify, analyze, and manage the risks the entity faces.  Risk assessment should take into account a wide range of risks, both internal and external, that a company faces and which must be dealt with to mitigate the risks.   Identification of risks is the responsibility of management and the Board of Directors, and in addition to formal risk assessments, can be accomplished by proactive planning, budgeting, and reacting to weaknesses identified by Internal Audit, external auditors, or others.

43.   **Effective Control Activities.**  Management must establish and execute policies and procedures to ensure that management's chosen actions are accomplished.  Control activities occur throughout the organization, at all levels and in all functions, and include a wide range of processes including approvals, authorizations, budgets, verifications, reconciliations, securing assets, performance reviews, and segregation of duties.  These can be referred to as preventive controls, detective controls, manual controls, computer controls, and management controls.  Control activities usually involve both a policy establishing what should be done, and a procedure or process to

CONFIDENTIAL

implement the policy.  The individual within the company that has responsibility for design of a specific process or its execution is the owner of the internal control.  The bonus accrual process included in Comtech's HR & Employee Compensation Guidelines,[26] and the focus of this case, is an example of a control activity and, specifically for SST, Christensen was the owner.

44.     **Effective Information and Communication.**   Management must communicate its expectations to employees and establish other lines of communication to enable employees to identify, capture, and exchange information relating to operations, finance, and compliance.  Examples include providing training, policies and procedures manuals and a complaint process.  Management may hold meetings to discuss operating and financial issues across the enterprise; distributing Internal Audit reports and action steps helps improve process weaknesses; and issues of all types may be raised to management in Board of Directors or Board committee meetings.

45.     **Effective Monitoring.**   An enterprise must continually assess its system of internal control, whether through ongoing monitoring or oversight, or specific evaluations.  Employees should be asked to affirm compliance with a company's policies or laws and regulations; internal and external auditors should audit the company and its operations and provide recommendations for improving any weaknesses in internal controls.  Identified issues should be reported to higher levels of authority and resolved on a timely basis.

---

[26] Eichberger00067.

CONFIDENTIAL

46.     Identification of weaknesses in ICFR can be reflected into three categories,[27] all of which require judgment by management, given their responsibility for internal controls, as to proper classification:[28]

47.     **Deficiency in internal control ("Deficiency").** A Deficiency in ICFR exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A Deficiency in *design* exists when (*a*) a control necessary to meet the control objective is missing, or (*b*) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met. A Deficiency in *operation* exists when a properly designed control does not operate as designed or when the person performing the control does not possess the necessary authority or competence to perform the control effectively.

48.     **Material Weakness.** A Deficiency, or a combination of Deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected, on a timely basis. A reasonable possibility exists when the likelihood of an event occurring is either reasonably possible or probable as defined as follows:

- **Reasonably possible.** The chance of the future event or events occurring is more than remote but less than likely.
- **Probable.** The future event or events are likely to occur.

49.     **Significant Deficiency.** A Deficiency, or a combination of Deficiencies, in ICFR that is less severe than a Material Weakness yet important enough to merit attention by those charged with governance.  By definition, a significant control deficiency is not a

---

[27] AU-C Section 265.06-.07.
[28] Tricia Sheehan Deposition (Rough Draft Transcript), August 13, 2020, at 14-17.

CONFIDENTIAL

situation that could result in a material misstatement of the financial statements and go undetected.  This was the category assigned to Houserman's alleged override of internal controls by Comtech executive management.

*Accrual Accounting and Estimates*

50.     Accrual accounting, pursuant to GAAP, attempts to record the economic or financial effects on an entity of transactions and other events and circumstances that have cash consequences for the entity in the periods in which those transactions, events and circumstances occur rather than only in the periods in which cash is received or paid by the entity.  This includes transactions of all kinds for an entity including, among others, credit transactions, barter exchanges, changes in the form of assets or liabilities and circumstances that have cash consequences for an entity but involve no concurrent cash movement.[29]  This includes items such as accrual of bonuses of all kinds by entities, such as the Houserman bonus.

51.     Determination of the amounts to record following GAAP many times requires estimates since exact amounts may not be known at the time transactions have occurred or are continuing to occur such as recording bonuses over several months and quarters during the year.  Estimates inherent in the financial reporting process inevitably involve assumptions about future events[30] such as achievement of certain pre-tax profit amounts combined with actual year to date results inherent in estimating bonus accruals, such as in this case.  Comtech discloses its use of estimates and assumptions in determining the amounts of assets, liabilities, disclosures, sales and expenses

---

[29] Statement of Financial Accounting Concepts No. 6:  Elements of Financial Statements, ACCRUAL ACCOUNTING, 139-140.
[30] FASB Accounting Standards Codification, 275, Risks and Uncertainties, Use of Estimates (U.S. GAAP).

CONFIDENTIAL

included in its consolidated financial statements and that actual results may differ from those estimates.[31]

52.   Management is responsible for the fair presentation of financial statements in conformity with GAAP and in so doing implicitly or explicitly make assertions regarding the recognition, measurement, presentation and disclosure of information in the financial statements and related disclosures.  Certain of these assertions are:

- Completeness – all transactions and events that should have been recorded have been recorded.
- Accuracy – amounts and other data relating to recorded transactions and events have been recorded appropriately.[32]

53.   Such assertions are key to accurately recording transactions in the accounting records for inclusion in the financial statements, including accruals subject to the estimation process, consistent with GAAP, such as Houserman's bonus.  Accuracy is essential, which means not recording amounts believed to be erroneous or based on flawed assumptions.  This is the responsibility of the internal control or process owner, which for Houserman's bonus accrual, was Christensen.

*My Opinions and Analysis*

*The calculations and presentations of pre-tax profit bonus goals reflected in the Goal Sheets for Fiscal 2017 and Fiscal 2018, respectively, were fraught with error, illogical expectations and a lack of knowledge by Comtech executive management as to how they were derived and managed.  Furthermore, Houserman's approach to dealing with these issues was appropriate, from an auditing and accounting perspective, and not an override of internal controls.*

54.   Houserman signed an employment agreement on February 27, 2016 with Comtech to become President of SST effective with the acquisition of TCS on February 23, 2016.[33]

---

[31] Comtech Telecommunications Corporation, July 31, 2018 Form 10-K, at F-13.
[32] AU§326.12.
[33] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 2; Comtech Telecommunications Corporation, July 31, 2017 Form 10-K, at 10.

CONFIDENTIAL

Houserman also executed Comtech's Standards of Business Conduct  on August 28, 2017 which includes, among other items, requirements relating to financial reporting and accounting including reporting of noncompliant situations to appropriate management levels within Comtech.[34]

55.   One policy and procedure that Houserman committed to comply with, pursuant to executing the Standards of Business Conduct, is Comtech's HR & Employee Compensation Guidelines, Policy #08-01-11, effective August 1, 2011, with changes through July 31, 2014.[35]  The HR & Employee Compensation Guidelines includes sections dealing with the Subsidiary President Annual Non-equity Incentive Plan, Goal Sheets and accrual for the resulting incentive payments.[36]

56.   An executive working for a company that is acquired by another and is offered and accepts a prominent position with the purchaser, such as in this situation, experiences a cultural learning curve with the new executive environment.  Houserman worked through this same process, including being on maternity leave from April 27, 2016 to August 13, 2016,[37] learning about Comtech's various policies and procedures, including the various bonus plans reflected on the Goal Sheets that are determined by the CEO.

57.   However, the CEO role changed quickly after Houserman joined Comtech from Dr. Stanton D. Sloane ("Sloane"), CEO at date of acquisition, to Kornberg on September 29, 2016.[38]  Furthermore, Sloane made the decision, prior to his departure, that the Call

---

[34] TSYS000502-000525, TSYS014507-014508.
[35] Eichberger00028-00072.
[36] Eichberger00063-00069.
[37] Lynne Houserman v. Comtech Telecommunications Corporation, Fred Kornberg and Michael D. Porcelain, Amended Complaint, at 3.
[38] Comtech Telecommunications Corporation, September 29, 2016 Form 8-K.

CONFIDENTIAL

Handling product line would be transferred to the ENT subsidiary run by Whitehurst, effective August 1, 2016.[39]

58.   In my opinion, an acquisition by another company, new culture, three-month maternity leave, transfer of a major division and new CEO, all occurring within a nine-month period, leading up to the first full fiscal year Goal Sheet Houserman reviewed and signed on November 16, 2016, for fiscal 2017,[40] created an environment that would be challenging for any executive joining a new company.  Porcelain testified that this was a hectic time relating to the development of the Fiscal 2017 Goal Sheets.[41]  Plus, in addition to all this activity, as I will discuss later, Comtech's corporate executive management group demonstrated an astounding weakness in governance managing the bonus process with Houserman, having its origin post acquisition of TCS.

59.   The Goal Sheet that Houserman signed on November 16, 2016 for Fiscal 2017 reflected a pre-tax profit goal of $6 million along with "actuals as defined less $6.297."[42] Comtech management calculated the $6 million pre-tax profit goal by starting with $12 million and then subtracting $6 million representing a rounded $6.297 million estimated loss for the Call Handling product line for Fiscal 2017.  This is reflected in a communication dated March 22, 2018 to Eichberger, attorney conducting the investigation relating to Houserman's alleged behavior, noting in the communication the amounts "Per 2017 Goal Sheet."[43]

---

[39] Eichberger00014-00015.
[40] Eichberger00022.
[41] Michael Porcelain Deposition, July 29, 2020, at 71-72.
[42] Eichberger00022.
[43] Eichberger000604-000606.

CONFIDENTIAL

60. The deduction of $6.297 million from the "actuals as defined" for Fiscal 2017 reflects the estimated loss of the Call Handling product line for Fiscal 2017 that was transferred to the ENT subsidiary effective August 1, 2016, the first day of Fiscal 2017.[44] Houserman testified that she was sent an email that confirmed such deduction was for Fiscal 2017 and there was not any communication that such an adjustment would be made in future years.[45]

61. However, I have not seen any evidence that anyone on Comtech corporate's executive team ever communicated to Houserman that such amount was being deducted from her *pre-tax profit goal* consistent with the *deduction from the actual amounts realized during Fiscal 2017*. In fact, Houserman did not know about this deduction until she was preparing for her deposition, long after she was terminated. Houserman testified that had she known about the mistake, she would have returned the bonus.[46] In fact, no one ever told Houserman about the pre-tax profit goal calculation being an error until long after the calculation and payment of the bonus and are now criticizing her for not noticing the mistake.[47]

62. Kornberg speculated in his interview with Eichberger that he believed that Sloane made a mistake deducting the $6.297 million from the pre-tax profit goal on the Fiscal 2017 Goal Sheet and corporate missed it and that he did not believe the decision was probably the appropriate one.[48] Porcelain noted in his interview with Eichberger that

---

[44] Eichberger00015; Eichberger00175.
[45] Lynne Houserman Deposition, November 21, 2019, at 207-208.
[46] Lynne Houserman Deposition, November 21, 2019, at 188-201.
[47] DT 0001015-0001022.
[48] Eichberger01217.

CONFIDENTIAL

Sloane made the error.[49]  The end result, according to Comtech executive management, was that Houserman was overpaid for her bonus by $57,090 for Fiscal 2017.[50]

63.     Kornberg later testified that Sloane made the error, he was not even aware of the error until Porcelain told him about it and he never discussed the error with Houserman.[51] In my opinion, this reflects poor governance on the part of Kornberg who did not even mention this issue with Houserman, once he finally learned of the error, even though he testified that he visited with her probably once a week.[52]  Porcelain also testified that Sloane was responsible and made the error.[53]

64.     It is apparent that Kornberg does not know what transpired with respect to the calculation which is astounding from a governance perspective, given he was the one from Comtech management who approved the Fiscal 2017 Goal Sheet as CEO of Comtech.

65.     On October 2, 2017, Houserman signed her Goal Sheet for Fiscal 2018, which reflected a deduction of $6.297 million from the actual pre-tax profit experienced for Fiscal 2018.[54]  I have not seen any evidence of Houserman being informed of the deduction of $6.297 million—nor any amount of deduction for that matter—for Fiscal 2018 or any later fiscal years.

66.     When Houserman signed the Fiscal 2018 Goal Sheet, she did not notice the penalty of reducing pre-tax actual profit by the same $6.297 million used for the Fiscal 2017 Goal Sheet.  However, on November 9, 2017, she discovered for the first time during a

---

[49] Eichberger01246-01247.
[50] DT 0001015-0001022.
[51] Fred Kornberg Deposition, July 30, 2020, at 50-61.
[52] Fred Kornberg Deposition, July 30, 2020, at 20-21.
[53] Michael Porcelain Deposition, July 29, 2020, at 54-55.
[54] Eichberger00020.

CONFIDENTIAL

discussion with Christensen that the Fiscal 2018 Goal Sheet included the exact same number of $6.297 million as a deduction from actual pre-tax profit. Houserman believed this to be a mistake which she did not notice at the time of signing the document on October 2, 2017 as she was focused on the overall goal, not the three lines comprising the goal.[55] Comtech executive management is critical of Houserman not noticing the issue when she signed the Fiscal 2018 Goal Sheet and that it took her 38 days to identify her concern.[56]

67. In my opinion, I do not find Houserman's delay in identifying the issue as problematic since, in my experience, even if an error is discovered a few weeks after it occurred, a healthy, open dialogue between executives, particularly between the President of a business unit and the CEO, should be a best practice in a company. As I will discuss later, such a healthy environment did not exist at Comtech, at least toward Houserman. Houserman was new to Comtech and different executives focus on documents in different ways with some zeroing in on the ultimate total. I do not find it troubling from an auditing or accounting perspective that Houserman did not notice the deduction until later. What's more important is that, upon learning of the apparent error, she did not blindly accrue based on that error, but instead raised it with the CEO and sought guidance on how to accrue going forward. That is exactly what she should have done, under the internal control framework in place at Comtech.

68. Comtech management also criticizes Houserman for not providing Christensen a copy of the final Fiscal 2018 Goal Sheet for him to use when performing the monthly

---

[55] Lynne Houserman Deposition, November 21, 2019, at 211-214.
[56] DT 0001015-0001022.

CONFIDENTIAL

accruals.[57]  However, Houserman testified that she believed Christensen received her final Fiscal 2018 Goal Sheet from corporate.[58]  This is reasonable given Christensen represented to Deloitte in responding to audit fraud inquiries that SST has effective controls in place to identify fraud and unintentional errors and that he maintains an open channel of communication with Porcelain and the corporate management team on any and all issues identified.  Christensen also represented that SST provides a monthly reporting package to corporate and discusses in depth with the corporate team, which would provide ample opportunity for corporate to flag any divergences from the final Fiscal 2018 Goal Sheet.[59]  Finally, on November 8, 2017, Comtech corporate accounting told Christensen in an email that Houserman had a signed goal sheet.[60]  It defies common sense for Comtech to claim that Christensen was not aware that Houserman's Goal Sheet had been fully executed.

69.    In my opinion, Houserman's position is appropriate that Christensen should have retrieved all final Goal Sheets from corporate to prepare accruals for SST's monthly and quarterly financial statements, given his top accounting position and represented coordination and communication with the corporate team.  Financial reporting within companies should be seamless and coordinated with all appropriate agreements and documents provided to subsidiaries for proper accruals.  Christensen is the owner of SST's accounting records and financial statements and he should have been proactive in seeking that which he needed to complete timely and accurate accruals pursuant to GAAP.

---

[57] TSYS038823.
[58] Lynne Houserman Deposition, November 21, 2019, at 227-228.
[59] DT 0000389-0000390.
[60] TSYS048550–51.

CONFIDENTIAL

70.    When Houserman first noticed on November 9, 2017 the $6.297 million being deducted from actual pre-tax profit she immediately concluded it was a mistake that was an inadvertent carryover from the Fiscal 2017 Goal Sheet, since she was never informed of and never agreed to a two-year penalty for transferring the Call Handling product line.[61]  In my opinion, applying the exact equal amount of deduction from actual pre-tax profit in Fiscal 2018 as was used in Fiscal 2017 seems quite odd and inconsistent with a logical approach, given that a product line's losses are rarely flat year over year. Moreover, effective August 1, 2016, the Call Handling product line was no longer Houserman's responsibility having been transferred to the ENT Division; therefore, it was illogical for Houserman to continue to be impacted for something out of her management control.  Given this illogical approach, it seems reasonable to me that Houserman would be confused as to the source of the repetitive deduction for Fiscal 2018 and, as the leader of SST, acted appropriately by raising it as an apparent error.

71.    Houserman's immediate reaction, consistent with appropriate GAAP and internal controls, was to send an email to Kornberg, CEO, on November 9, 2017 notifying him of the error of deducting $6.297 million from actual pre-tax profit for Fiscal 2018 and requesting a revised Goal Sheet for signature.[62]  The approach taken by Houserman, in my opinion, from an internal control process perspective, was appropriate in order to achieve resolution and correct a potential error.

72.    I have not seen any evidence that any deduction against actual pre-tax profit beyond the Fiscal 2017 Goal Sheet was contemplated by Sloane or Kornberg as a result of the transfer of the Call Handling product line.  Kornberg stated in his interview with

---

[61] Lynne Houserman Deposition, November 21, 2019, at 213; Eichberger01194.
[62] Eichberger01194; TSYS014465; Lynne Houserman Deposition, November 21, 2019, at 218.

CONFIDENTIAL

Eichberger that he did not know what Sloane decided regarding deducting the $6.297 million for years subsequent to Fiscal 2017 and that everyone has a different recollection of the calculation.  Kornberg also noted that no one has documentation of what Sloane decided so he just continued the prospective deduction to do what Sloane did and that he did not have enough information to know what was decided.[63]  Porcelain also confirmed there was not any documentation of how the Call Handling product line adjustment was to be made.[64]

73.   Upon receiving Houserman's email on November 9, 2017, Kornberg requested Houserman to send the agreement regarding transferring the Call Handling product line to ENT to which Houserman responded the next day with the email regarding generally, without amounts, how the bonus pool would be calculated, which was the only documentation available.  It is also revealing to note that following this email to Kornberg, Porcelain emailed Kornberg that he should wait until Monday to respond and the issue is more complicated than appears.  Not receiving any further response, Houserman followed up with Kornberg on November 28, 2019 requesting resolution of when the error would be corrected on her Fiscal 2018 Goal Sheet to which Kornberg responded he would get back with her after he got the facts of what Sloane, Houserman and Whitehurst agreed to.[65]  Here, too, Houserman's actions were consistent with attempting to achieve the correct GAAP answer and with proper internal controls.

74.   Kornberg never responded with a resolution regarding whether or when the Fiscal 2018 Goal Sheet error would be corrected, even though Houserman had contacted Kornberg

---

[63] Eichberger01217-01219.
[64] Michael Porcelain Deposition, July 29, 2020, at 152.
[65] Lynne Houserman Deposition, November 21, 2019, Exhibit 9; TSYS014462-014470; TSYS074608-074610.

CONFIDENTIAL

on November 9 and November 28, 2017, and raised the issue in her SOX sub-certifications and in her President's Reports for December 2017 and January 2018.[66] On February 13, 2018 SST was requested by the Corporate Controller to reverse what he described as an over accrual of the bonus amount for the quarter ended January 31, 2018 as SST had accrued the bonus assuming the $6.297 million error would be corrected. Houserman emailed Kornberg upon receiving the correction requesting that the error, unresolved for three months, be corrected for the 2018 bonus calculations and even offered to meet with the Compensation Committee of the Board of Directors. Kornberg again stalled and emailed Houserman that she needed to be patient, that no correction would be made until the situation is evaluated, that there were many items to be considered and that her accrual was not authorized.[67] Bottom line, Kornberg, as CEO who signed the Fiscal 2018 Bonus Sheet, never gave Houserman an answer to her question, that was clearly legitimate, given the confusion about the bonus calculations regarding the Call Handling product line transfer. Houserman, again, was appropriately attempting to resolve the apparent GAAP error consistent with proper internal controls.

75.    I did not see any evidence in my review of the various emails and interview notes that Kornberg or Porcelain communicated with Houserman that the deduction of $6.297 million from pre-tax profit on the Fiscal 2018 Goal Sheet was correct and that she was wrong in her assumption that it was an error. However, contrary to his responses in his Eichberger interview,[68] Kornberg testified that he told Houserman several times

---

[66] TSYS074608–10; TSYS024643–024648; John Sarno Deposition, July 22, 2020, Exhibit 17A; Fred Kornberg Deposition, July 30, 2020, Exhibits 9, 11A and 12A.
[67] Lynne Houserman Deposition, November 21, 2019, Exhibit 9; TSYS014462-014470.
[68] Eichberger01214-01222.

CONFIDENTIAL

between November 10, 2017 and November 28, 2017 that the Fiscal 2018 Goal Sheet was correct and there was not an error.  He also testified, however, that he could not locate any written agreement documenting the deduction process and never called Sloane for clarification.  Further, Kornberg dismissed in his testimony the documented requests by Houserman seeking resolution of the error by repeating that he had responded to her verbally, by insisting that he had told her to be patient, or by offering other reasons why her requests were off base.[69]

76.     Kornberg also tried to justify applying the Call Handling product line reduction against SST's pre-tax profit across multiple years by noting that Whitehurst had told him that he would not have taken on a multi-year loss without a benefit.[70]  Even if that is the case, there is no accounting principle requiring that any multi-year benefit that is provided to Whitehurst has to be balanced by a corresponding multi-year penalty to Houserman.  These bonus goals, as well as any adjustments or penalties, are set at corporate management's discretion, and, accordingly, do not need to be zero-sum across the divisions.  In other words, no accounting principle would require there to be symmetry between Whitehurst's and Houserman's actual pre-tax profit bonus calculations with respect to the Call Handling product line.  Indeed, it would be illogical for there to be such symmetry, as only Whitehurst—and not Houserman—was prospectively responsible for the Call Handling product line.

77.     In my opinion, the disconnect between Kornberg's testimony, his Eichberger interview and the actual documentation regarding the communication that there was not an error, is concerning and demonstrates a glaring breakdown in communication between and

---

[69] Fred Kornberg Deposition, July 30, 2020, at 65-68, 71, 79-85, 99-104, 116-119, 126-130, 134-136.
[70] Eichberger01219.

CONFIDENTIAL

among Comtech executive management and Houserman.  The conflicting interview and testimony statements and evidentiary documents, in my opinion, only further confirm the chaos at the Comtech executive level regarding Houserman attempting to clarify an issue that should have been simple to resolve definitively by email, which also would have created clear documentation to support the accrual going forward. Again, Houserman was attempting to resolve this issue pursuant to proper internal controls and GAAP, without success.

78.     I continue to find Kornberg's approach—specifically, leaving one of his Presidents, whom he was complimentary of during his Eichberger interview,[71] dangling for three months with no resolution of an issue that, in my opinion, should have taken maybe a day to resolve—to be a glaring weakness in governance internal controls.  Comtech executive management certainly, in my opinion, appears to be dysfunctional in this process, as they are blaming a former CEO, Sloane, who is no longer at the company, have no documentation in the personnel and Compensation Committee files for how the Call Handling product line bonus calculation issue was to be handled, and left the issue to the speculation and delay by Kornberg.

79.     Comtech executive management further criticized Houserman for indicating, in a meeting on November 29, 2017 with Deloitte, that she was not aware of any violations in Comtech's accounting practices, that she would adhere to Comtech's accounting policies and procedures and that she was not planning to make any changes to the first quarter of Fiscal 2018 SST financial statements.  Comtech contends that she violated this when she called for the increased bonus accrual in November 2017 that did not

---

[71] Eichberger01219.

CONFIDENTIAL

include the Call Handling product line adjustment.[72]  However, the SST first quarter Fiscal 2018 Quarterly Checklist did include full disclosure of the unresolved bonus accrual.  Furthermore, the additional bonus accrual made in November 2017 reflected what Houserman, with Christensen's concurrence, believed to be the proper accrual given the belief that an error was made in the Call Handling product line adjustment. Again, in doing so, Houserman followed proper internal controls to achieve correct GAAP accounting which, in my view, was reasonable.

80.     Sarno, Deloitte engagement partner on the Comtech audit, had key testimony on this point.  *Sarno testified that, if Houserman had believed that the Fiscal 2018 Goal Sheet contained an error, and if Houserman had been requesting resolution of this issue from management without any response until Kornberg stated on February 13, 2018 that the Goal Sheet was correct, it would <u>not</u> have been a control Deficiency for her to instruct Christensen to accrue for the higher bonus amount.*[73]  This testimony confirms my opinion that Houserman's actions of allegedly overriding of internal controls was not an issue at all and did not rise to the level of even a Deficiency—and certainly not a Significant Deficiency.  Thus, Houserman did not believe her actions were unjustified and a violation of Comtech's policies and procedures—the circumstances were all about resolving what was deemed to be an error that got ignored for three months.

81.     One of the action steps resulting from the discussion on February 13, 2018 was that Porcelain was going to determine if in fact Houserman was actually penalized in her Fiscal 2017 bonus for the $6.297 million deduction from her actual pre-tax profit.[74]  As

---

[72] DT 0001015-0001022.
[73] John Sarno Deposition, July 22, 2020, at 245-246.
[74] TSYS079374.

CONFIDENTIAL

I have discussed, such amount was mistakenly deducted from her budget amount negating the effect of the deduction; however, it appears Porcelain, on February 13, 2018 and into March 2018 did not realize such mistake was made[75] (although his testimony, with no supporting documentation, indicates he knew before Houserman's Fiscal 2017 bonus was determined[76]). That he did not recognize this mistake and bring it to Houserman's attention earlier is astounding, particularly given what transpired regarding Houserman's bonus calculations.  This again, in my opinion, reflects the lack of knowledge and control Comtech executive management had in this situation.

82.     Porcelain criticized Houserman for not requiring the recording of the Fiscal 2018 bonus consistent with the executed Bonus Sheet and said that she did not have the authority to do otherwise.[77]   However, Porcelain, in making such a comment, ignored the dysfunction of Comtech's executive team in dealing with this issue and the total absence of communication to resolve the issue.  What is missing from Porcelain's comments is criticism of Christensen's behavior as the top accounting person in SST who interacts directly with Porcelain's team in maintaining the books and records of Comtech.  Christensen did not contact Porcelain's team to deal with the issue and was, in my opinion, as the top accounting person the focal point for the alleged incorrect accounting for the bonus accrual.

83.     Houserman is not an accountant, was doing what she thought was appropriate in the circumstances, and was following proper internal controls, given her attempted dialogue with Kornberg, which went ignored.  Christensen should have been the

---

[75] TSYS025250-025259.
[76] Michael Porcelain Deposition, July 29, 2020, at 77-82, 86.
[77] TSYS079369.

CONFIDENTIAL

stopgap for this issue as the Vice President, Finance of SST.  If any fault is to be levied on the process assuming there was not an error, it should be on Christensen, not Houserman.  Christensen was owner of the internal control and should have pushed back on Houserman if he believed she was off base with her untrained eye not sensitive to accounting accrual issues.  In fact, a series of emails during late February and early March 2018, from Paul Steo, head of Internal Audit for Comtech, to Christensen regarding the sequence of events and  support for various of the bonus entries clearly demonstrates that Christensen was the owner of SST accounting having dialogue with Internal Audit who was then forwarding the information to Porcelain.[78]

84. Sarno testified that Christensen should have pursued Houserman and Comtech corporate senior management regarding any question about a potential error in the bonus accrual, and that corporate senior management should not have set the matter aside and should have responded timely to Christensen given quarterly reporting requirements of Comtech.  Likewise, corporate senior management should also not have set aside any similar inquiries made by Houserman and should have timely responded and instructed her to have her finance team accrue based on an estimate of the amount expected to be paid.[79]

85. Houserman did not ignore internal controls relating to the bonus accruals.  Each quarter the SST Division completed the Quarterly Checklist, or sub-certification, which was sent to corporate management signed by the President and Vice President, Finance. The Quarterly Checklist represented that SST's financial package for the respective quarter was complete, accurate and in compliance with generally accepted accounting

---

[78] TSYS041264-041275.
[79] John Sarno Deposition, July 22, 2020, at 58-62.

CONFIDENTIAL

principles, that SST adopted and maintained internal controls and disclosure processes designed to provide reasonable assurance that SST's financial transactions were properly authorized, that SST's assets were safeguarded against unauthorized use, and that SST's transactions were properly recorded and reported.  In my experience, these are customary subsidiary sub-certification representations to corporate management to enable Comtech's CEO and CFO to report publicly on the design and operating effectiveness of ICFR in SEC filings, pursuant to the guidelines of the SOX legislation included in the securities acts.

86.     Houserman and Christensen both signed the Quarterly Checklist for the Quarters Ended October 31, 2017 and January 31, 2018, respectively.  The Fiscal 2018 Goal Sheet bonus issue was prominently disclosed in both documents.  First, for the Quarter Ended October 31, 2017, Houserman and Christensen disclosed the error of deducting the $6.297 million from actual pre-tax profit for Fiscal 2018 and the potential impact for the first quarter and noted that Houserman had requested the CEO to correct the error.[80] Second, for the Quarter Ended January 31, 2018, Houserman and Christensen disclosed in the Quarterly Checklist the amounts recorded by SST to correct for the error with SST representing the issue to be unresolved and open.  Reference was also made by SST to disclosure of the error in the First Quarter Quarterly Checklist, noted above.[81] The transparency demonstrated by SST through these disclosures was reflective of strong internal controls seeking correct GAAP accounting.

87.     In addition, the bonus accrual spreadsheet prepared by Christensen's team at  SST and sent to corporate included a notation relating to the exclusion of the $6.297 million

---

[80] TSYS024643.
[81] Quarterly Financial and Disclosure Consideration Checklist for the Quarter Ended January 31, 2018.

CONFIDENTIAL

deduction from pre-tax profit for Fiscal 2018 stating, "Removed Per Lynne Houserman Request" and highlighting where the number would have been on the schedule.[82]  This again clearly indicates Houserman was not overriding internal controls but rather full disclosure was made believing that an error occurred.

88.    In my opinion, this clearly does not reflect a situation in which Houserman was overriding internal controls when accruing for the Fiscal 2018 bonus by eliminating the $6.297 million from the actual pre-tax profit amount.  Houserman and Christensen were prominently disclosing the issue as well as the attempted contact with Kornberg to resolve the situation.  In my experience, executives overriding internal controls do not fully disclose the issue in subgroup financial reporting and internal control representations to corporate and reach out to the key decision maker, the CEO in this case, to resolve the issue.  This situation was fraught with a lack of both documentation and informed, timely management decisions.  In my view, Houserman took the correct action to attempt to reach resolution with the CEO and was ignored by Kornberg for three months—the weakness in internal control is not at the hands of Houserman, but, rather, falls flatly on Kornberg, who would not or could not resolve the issue.

89.    I also reviewed the employee agreement between Comtech and Houserman executed by Houserman on February 27, 2016 in which the contractual meaning of "willful breach" of the employee agreement is described as, among other factors, ". . . no act or failure to act shall be considered "willful" if you reasonably believed in good faith that such act or failure to act was in the best interests of the Company and its affiliates. . ."[83]

---

[82] SST PDO6 Accrual FY18.
[83] Employee Agreement between Comtech Telecommunications Corporation and Lynne Houserman, February 11, 2016.

CONFIDENTIAL

With respect to this contractual provision regarding good faith, I note my conclusion that Houserman adhered to internal controls to achieve proper GAAP accounting particularly in view of the continued failed attempts to get Comtech executive management to respond to the assumed error question.

90.   Houserman testified that her actions of accruing for the Fiscal 2018 bonus after eliminating the deduction of $6.297 million from actual pre-tax profit was in the best interest of Comtech.[84] In my opinion, based on my decades of auditing and accounting experience, Houserman's actions were conducted in the spirit of strong internal controls, given her focus on what appeared to be an error in the absence of documentation for the $6.297 million deduction, the absence of clarity from her supervisor and CEO, Kornberg, and her approach of full disclosure to Kornberg and in the Quarterly Checklist.

91.   Kornberg stated in his interview and emails that Houserman should be patient and that there was plenty of time to resolve since bonuses were not paid until September.[85]  But what Kornberg ignores with his statement is that Comtech is a public company with Form 10-Q public reporting each quarter accompanied by quarterly reviews conducted by Comtech's independent auditors, Deloitte.  By inappropriately pushing the final answer on this issue to year end, Kornberg's attitude set a poor tone at the top for proper quarterly accruals of bonuses.  His attempt to stall the answer to Houserman and then terminate her for overriding internal controls in view of his own disregard of the same internal controls is astounding.

---

[84] Lynne Houserman Deposition, November 21, 2019, at 246, 255, 264, 266, 268, 314.
[85] TSYS014462-014470; Eichberger01220.

CONFIDENTIAL

92.     Another key area of focus was the criticism of Houserman by Comtech executive
management for directing Christensen to ignore, when accruing the bonus during the
first and second quarters of 2018, the deduction of $6.297 million from actual pre-tax
profit reflected in the executed Fiscal 2018 Goal Sheet.  The criticism also relates to a
member of Comtech's finance team, Michael Bondi, instructing Houserman and
Christensen to reverse the additional bonus accruals relating to eliminating the $6.297
million from the actual pre-tax profit bonus calculation for the first and second quarters
of Fiscal 2018, with which the SST Division complied.  But given that the issue was
still unresolved and Houserman still believed there was an error in the calculation, she
reasonably continued to instruct Christensen to accrue the bonus ignoring the $6.297
million deduction for actual pre-tax profit, and did so with full disclosure.  Houserman
testified that she believed this to be in the best interests of Comtech given the risk of a
needed correcting catch up entry at a later date.[86]  Avoiding errors and potential
restatements is a strong internal control for proper GAAP accounting for a public
company.

93.     Comtech executives communicated to Houserman that she *willfully withheld* the Fiscal
2018 Goal Sheet from Christensen resulting in his incorrectly recording the bonus
accrual[87] and Eichberger stated that under Comtech's HR and Employee Guidelines
Houserman had no discretion in providing the Fiscal 2018 Goal Sheet to Christensen
for accrual purposes.[88]  I have not seen any evidence that Houserman willfully withheld
the Fiscal 2018 Goal Sheet from Christensen.  She testified that after signing and

---

[86] TSYS038822-038825; Lynne Houserman Deposition, November 21, 2019, at 248-258.
[87] DT 0001019.
[88] Eichberger00013.

CONFIDENTIAL

providing the Fiscal 2018 Goal Sheet to Porcelain and Kornberg, she thought that Christensen would get a copy from Comtech's corporate finance group.[89] Furthermore, from my reading of Comtech's HR and Employee Guidelines, I did not find any requirement to provide the Goal Sheet to the top finance person in the subsidiary; rather, the Goal Sheet is signed by the CEO and subsidiary president and the subsidiary finance personnel are responsible for accruing the appropriate amount each month.[90] In my opinion, Eichberger was overreaching in her interpretations and conclusions in her investigative report and holding Houserman to a standard not required by Comtech's own policies and procedures.

94.    I noted in my review of certain emails that Houserman did send Christensen the Fiscal 2018 Goal Sheet signed by Kornberg on November 9, 2017, that had not been signed by Houserman.  Such Goal Sheet reflected the deduction of $6.297 million from the actual pre-tax profit which Christensen picked up on immediately, noting that he thought it was unfair and "seem[ed] insane" for the same deduction to apply in Fiscal 2018 as Fiscal 2017.  (Christensen also apparently noticed what Houserman had not— that no equivalent deduction from the pre-tax goal amount as was done for Fiscal 2017, which again raises the question of why he, as the internal control owner for accounting in SST, was not more proactive in trying to resolve any ambiguities and irregularities in the accounting records that he oversaw at SST).  Houserman emailed Christensen that she was working on the issue with Kornberg without any resolution—clearly Christensen was questioning the correctness of the $6.297 million deduction.  The Fiscal 2018 Goal Sheet, that was not signed by Houserman, did include the $6.297

---

[89] Lynne Houserman Deposition, November 21, 2019, at 202.
[90] Eichberger00064-00067.

CONFIDENTIAL

million deduction and was not hidden from Christensen who had email communications with Maria Ceriello, apparently in Comtech corporate accounting, regarding the overall calculation pursuant to such Goal Sheet.  If he thought he was accruing the bonus in error beginning in November 2017 or needed further clarification on the bonus accrual, he had every opportunity and responsibility to have continued dialogue with Comtech corporate accounting to resolve the accrual issue, which he did not.[91]

95.     In my opinion, this confused process by Kornberg and Porcelain dealing with one of Comtech's Presidents regarding the critical bonus calculation demonstrates a poor tone at the top, questionable decision making without any support but rather based on speculation, continuation of the status quo with no support, ultimately resulting in terminating a key subsidiary executive for overriding internal controls when top management created the situation that Houserman was trying to get resolved.  In my opinion, Kornberg's and Porcelain's conduct fails the test of strong governance internal controls inherent in the COSO guidelines as foundation for ICFR reporting signed by the CEO and CFO in Comtech's Form 10-K.  Also, in my opinion, the tone at the top governance internal control weakness clearly was not at the SST Houserman level, but rather at the Comtech executive management level.  Houserman's tone at the top was to get the right answer working with her Vice President, Finance for resolution within the internal control structure of SST.  This was not an SST tone at the top weakness; it was a strength.  In fact, Tricia Sheehan ("Sheehan"), partner at PwC, testified that the

---

[91] TSYS041310-041312; TSYS025267; TSYS048553-048555; TSYS070715-070716; TSYS070730-070731; TSYS070740-070741.

CONFIDENTIAL

PwC Internal Audit team never made a determination that Houserman had a tone at the top issue at SST.[92]

96.     Further, given the absence of documentation for the $6.297 million deduction in the Fiscal 2018 Goal Sheet, the absence of clarity from Houserman's supervisor and CEO, Kornberg, the dysfunctional behavior and overreaching in application of Comtech's policies and procedures, Comtech executive management's weak tone at the top governance for internal controls, Houserman's reasonable assumption of an error that would require correction, and Houserman's appropriate approach to the issue and full disclosure to Kornberg and in the Quarterly Checklist, it was not an appropriate conclusion made by Comtech executive management that Houserman overrode internal controls.

*Comtech executive management incorrectly concluded that Houserman overrode internal controls and failed to factor in the full disclosures made by Houserman, unresolved calculations and dialogue that was confusing and lacking timeliness.  Furthermore, Comtech relied upon the conclusions of Eichberger's investigation, which was not appropriate, given Eichberger did not conclude on override of internal controls.*

97.     In my opinion, in view of my discussion above, Comtech executive management incorrectly concluded that Houserman overrode internal controls.  Concluding that Houserman violated Comtech policies and procedures and overrode controls takes the position that she was engaged in actual or suspected fraudulent activity, as noted to Deloitte by Porcelain, CFO,[93] Larry Waldman, Chairman of the Audit Committee,[94]

---

[92] Tricia Sheehan Deposition (Rough Draft Transcript), August 13, 2020, at 59.
[93] DT 0000371-0000378.
[94] DT 0000379-0000383

CONFIDENTIAL

and the PwC Internal Audit team for Comtech,[95] during their fraud discussions with Deloitte which is a standard, required audit procedure.

98.     Furthermore, Deloitte documented, *as an identification of fraud*, the alleged override in internal controls in their Fiscal 2018 audit workpapers, and specifically noted that the bonus over accruals were identified and revised by Comtech corporate group, not Deloitte, for the first and second quarters of Fiscal 2018.   Deloitte noted that, " . . . President of this business unit instructed the SST VP of Finance to increase the bonus amount attributable to the President and the local employee bonus pool and the SST VP of Finance did improperly increase such amount."  Deloitte also noted that Houserman complained during the first quarter of Fiscal 2018 about the mistake regarding the bonus calculation but, having not received a resolution from the CEO, Compensation Committee or Board of Directors, she intentionally misled the SST Vice President, Finance by providing an unsigned Goal Sheet for Fiscal 2018 leading to the alleged over accrual.  *However, Deloitte also noted that there was no indication or evidence of fraud, additional testing did not reveal any other issues with Houserman overriding internal controls and the over accruals were not material.*  Notably, neither Christensen nor Kent Hellebust, the President taking over from Houserman, disclosed any awareness of any fraud during their fraud inquiry discussions with Deloitte. Deloitte concluded the issue was a Significant Deficiency in internal control consistent with conclusion reached by Comtech and reflected by PwC, as Comtech's Internal Audit team.[96]  Sarno testified that he was not aware of any other inappropriate behavior

---

[95] DT 0000384-0000387.
[96] DT 0000439; DT 0000396-0000401; DT 0000410; DT 0000388-0000391; DT 0000392-0000395; PwC 000142, 000286; John Sarno Deposition, July 22, 2020, at 178.

CONFIDENTIAL

beyond the alleged override of internal controls[97] plus Deloitte evaluated whether any fraudulent activity was evident in the process[98] and, as noted above, concluded there was not any fraud.

99.     What is missing in all the discussions with Porcelain and Waldman and Deloitte's documentation of Comtech's identification of the issue, is all the evidence I have previously discussed clearly demonstrating that Houserman raised the error with Comtech management, did not get a response, and did not override internal controls.  It appears that Deloitte was not provided with all the evidence I have reviewed beyond what they reference as the first quarter of Fiscal 2018 complaint by Houserman. Furthermore, it appears from Sarno's testimony that Deloitte believed the matter had been concluded prior to Kornberg's notice on February 13, 2018 to Houserman that the Fiscal 2018 Goal Sheet did not contain an error.[99]

100.    It is key to again emphasize that this issue was identified and elevated by Comtech, not Deloitte or PwC, and, in my opinion, Comtech inappropriately ignored the logical facts and circumstances leading Houserman to do what she did which certainly was not an aggressive, fraudulent activity, but rather a demonstration of strong internal controls by Houserman.   What it does represent is an unclear and confusing situation, exacerbated by a lack of documentation and the procrastination and lack of knowledge of the CEO, Kornberg.  There is a notable absence, on Houserman's part, of any tone or attitude of fraudulent or illicit behavior that is the essence of overriding internal controls.

---

[97] John Sarno Deposition, July 22, 2020, at 54.
[98] John Sarno Deposition, July 22, 2020, at 70.
[99] John Sarno Deposition, July 22, 2020, at 242-246.

CONFIDENTIAL

101.    As stated in Managing the Business Risk of Fraud: A Practical Guide sponsored by The
        Institute of Internal Auditors, The American Institute of Certified Public Accountants
        and the Association of Certified Fraud Examiners in a discussion regarding risk of
        management's override of controls, "It is reasonable to assume that individuals who
        are intent on committing fraud will use their knowledge of the organization's controls
        to do it in a manner that will conceal their actions."[100]  The point is one of concealment
        to defraud a company by knowing controls so well that something can be done illicitly
        and hidden in order to benefit the individual overriding the controls.

102.    Based on my careful review of the evidence provided, I saw nothing that indicated
        Houserman was trying to cover up anything.  To the contrary, she was instructing the
        SST Vice President, Finance to record the higher amount of bonus to avoid a later error
        correction, with full disclosure to the corporate executive team in the emails sent over
        a three-month period to Kornberg, discussions, notation in the bonus accrual
        spreadsheet and disclosure in the first and second quarters of Fiscal 2018 Quarterly
        Checklists.  Also, as previously noted, I have seen no evidence in which Houserman
        intentionally misled Christensen by giving him an unsigned Fiscal 2018 Goal Sheet.  If
        he, in fact, had only a "draft," Goal Sheet, it is his responsibility to seek the executed
        Goal Sheet from the CFO or members of his team which Houserman assumed he had
        done.  His adherence to internal controls to accomplish the proper accrual dictates such
        action.

103.    To blame the President, Houserman, as overriding the Vice President, Finance to record
        such amounts is not realistic as she is not an accountant, nor trained in accounting.  That

---

[100] Managing the Business Risk of Fraud: A Practical Guide sponsored by The Institute of Internal Auditors, The American Institute of Certified Public Accountants and the Association of Certified Fraud Examiners, at 23.

CONFIDENTIAL

was Christensen's job as Vice President, Finance and his close affiliation with the corporate finance team.  Furthermore, Houserman was not trying to hide anything as is the general approach taken by executives to override controls to their benefit.  Quite the opposite, full disclosure was prominent, even to Christensen, which demonstrates adherence to strong internal controls.

104.    Furthermore, Comtech's HR and Employee Guidelines requires that the *SST finance team, not the President,* accrue appropriate bonus amounts which is the proper requirement under GAAP.  Houserman noted that it was Christensen's responsibility to make the proper accruals consistent with the internal controls even ignoring her direction if he deemed she was not correct.[101] The accounting for the accrual should be a discussion between Christensen and Porcelain, or his team, as accountant to accountant.  Houserman appropriately attempted to have an executive to executive discussion with Kornberg to resolve the issue but was ignored.  Also, under GAAP, determining the amount to accrue requires judgment based on the facts and circumstances of a particular situation, and no accounting that would result in an error in financial statements should be recorded.  In my opinion, Houserman's actions were to avoid recording what she deemed to be an error, because doing so would be inappropriate.  To push the responsibility for accounting to Houserman, for all the reasons previously discussed, arguing she overrode internal controls and misled or strong-armed Christensen, was inappropriate and, in my opinion, has no foundation.

105.    Furthermore, Sarno testified that the Comtech subsidiary Presidents should oversee the accrual process for non-equity compensation by basing accruals on their current

---

[101] Lynne Houserman Deposition, November 21, 2019, at 176-179.

estimates of achievement of goals and documentation reflecting what they reasonably expect to be paid.[102]  This is consistent with best practices for accrual accounting, and is exactly what Houserman was attempting to do given the belief that an error had occurred, to be confirmed by Kornberg.

106.   In my view, from a business observation perspective, given my 46 years of experience, this bonus calculation is convoluted and lacking in business logic.  I can easily see why Houserman was questioning the calculation taking the exact same loss amount used in the prior year calculation and deducting it from actual pre-tax profit for the current year as a penalty of some sort for a bad business that was transferred out of Houserman's responsibility without any explanation or documentation, all of which was exacerbated by a CEO, Kornberg, who ignored the issue.  To then conclude, against this backdrop, that she overrode internal controls by trying to correct what appeared to be an error while fully disclosing the issue and not trying to hide it, is astounding.  Plus, based on my review of the testimony of Sarno, I do not believe Deloitte was provided with all the facts leading to her action, and Deloitte, as one would expect, accepted management's call on the issue, given it is Comtech's financial statements and ICFR structure.

107.   Also, worthy of noting, Eichberger in her investigation report never reached a conclusion on whether Houserman overrode internal controls; rather, she only reaches conclusions on gender discrimination and retaliation.[103]  However, the scope of her work related to actions involving Houserman's Fiscal 2018 Goal Sheet,[104] and so the

---

[102] John Sarno Deposition, July 22, 2020, at 46-47, 98-99.
[103] Eichberger00010-00018.
[104] Nicole Eichberger Deposition, July 23, 2020, at 194-195.

46

question of whether Houserman overrode internal controls should have been fundamental to her investigation.  Only by first reaching a conclusion on this question could one properly evaluate the actions taken by Comtech executive management.  But Eichberger did not even visit with anyone with public accounting expertise in order to gain a solid grasp on what transpired regarding Houserman's Fiscal 2018 bonus.[105]  If she did not have the expertise to deal with the internal controls issue, she could have hired an independent internal controls expert.

108.    I compared a draft of Eichberger's investigation report with her final report and noted certain changes.  For example, wording reflecting the communication delays from Kornberg to Houserman and lack of follow up by Porcelain regarding the Fiscal 2018 Goal Sheet were deleted from the draft.  Additionally, the word "error" relating to Houserman's Fiscal 2017 bonus calculation, discussed above, was replaced with "Houserman's windfall" and "overpayment."  Furthermore, Eichberger erred in her report when she mentioned Whitehurst was penalized in his bonus calculation for Fiscal 2017 when, in fact, *he actually received a benefit,* resulting from the add back of $6.297 million to his pre-tax profit for Fiscal 2017 which was the entire point of the exercise to benefit Whitehurst and penalize Houserman.[106]  That misunderstanding on Eichberger's part indicates to me that Eichberger lacked even a basic understanding of the mechanics of the bonus adjustment at issue in her investigation.

109.    *In my opinion, it is an unrealistic and inappropriate leap to conclude, in these circumstances, that Houserman overrode internal controls in a fraudulent context.  I believe Comtech should have been pleased with Houserman's behavior trying to*

---

[105] Nicole Eichberger Deposition, July 23, 2020, at 262-264.
[106] Eichberger00806-00815; Eichberger01350-01356; Nicole Eichberger Deposition, July 23, 2020, at 364-365.

CONFIDENTIAL

> *resolve a very confused issue, with full disclosure, that no one on the Comtech executive*
>
> *team would take ownership of.*

***Comtech uniquely identified the alleged override of internal controls by Houserman as a Significant Deficiency which was overreaching given the dysfunction of Comtech's executive management in dealing with Houserman's questions, multitude of historical Deficiencies at Comtech and absence of evidence of any other SST internal control issues involving Houserman.***

110. Comtech corporate management identified the alleged override of internal controls by Houserman and related lack of challenge by the Vice President, Finance of the documentation as a Significant Deficiency and PwC, as Comtech's Internal Audit team, reflected such information in its workpapers.[107] PwC's Sheehan testified that the override of internal controls was identified by Comtech corporate management and communicated to PwC's Comtech Internal Audit team, including its classification as a Significant Deficiency.[108] Deloitte included the matter in its SOX workpapers noting that the Significant Deficiency of overriding internal controls was identified by Comtech corporate management,[109] who notified Deloitte, which was confirmed by Sarno in his testimony.[110] In fact, Deloitte prepared its second quarter Fiscal 2018 review document for the March 6, 2018 Audit Committee meeting in which Deloitte noted they were not aware of any Significant Deficiencies or Material Weaknesses in ICFR even though Deloitte had known about the issue for a month or two before the Audit Committee meeting, clearly indicating that it was Comtech that identified the override in internal controls.[111] As expected, Deloitte ultimately agreed with

---

[107] TSYS062993-062996; PwC 000268; PwC 000276-000278; PwC 000279-000285.
[108] Tricia Sheehan Deposition (Rough Draft Transcript), August 13, 2020, at 30, 33, 39-41, 43-44, 55.
[109] DT 0000439; DT 0000589-0000592; DT 0000396-0000401.
[110] John Sarno Deposition, July 22, 2020, at 63, 102-106, 107-108, 117, 135.
[111] John Sarno Deposition, July 22, 2020, at 119-126; TSYS080021.

CONFIDENTIAL

Comtech's conclusion that this was a Significant Deficiency; in my opinion, independent, external auditors, will rarely, if ever, take a position against a client's decision and downgrade the rating given the financial statements and system of ICFR belong to the client.

111.   I noted in my review that during the fiscal period 2015-2018, Comtech had a total of 133 internal control Deficiencies and only one Significant Deficiency which was the Fiscal 2018 alleged override of internal controls, the issue being considered in this case. There have not been any Material Weaknesses.  Also, subsequent to SST's acquisition, SST had 6 of the 32 Deficiencies in Fiscal 2018 and 14 of the 66 Deficiencies in Fiscal 2017,[112] and this reflects the results of the extended testing performed subsequent to the identification of the alleged override of internal controls by Houserman, which resulted in no additional issues.

112.   In my opinion, it is not unusual for a company to have several Deficiencies, which reflect internal controls that are not designed properly or not being performed as designed and are lesser in severity than a Significant Deficiency or Material Weakness. What does strike me as highly unusual is that over a four-year period there was not one Deficiency characterized as a Significant Deficiency until this alleged aberration occurred during Fiscal 2018.

113.   I also noted in my review of several documents that Comtech executive management criticized SST for internal control Deficiencies subsequent to its acquisition, yet none of these Deficiencies rose to the level of a Significant Deficiency.  I find it odd that given the harsh view by Comtech executive management of the results of internal

---

[112] PwC 000384-000389.

CONFIDENTIAL

controls testing at SST that none were elevated to a Significant Deficiency until Houserman's situation arose.[113]  In my view, certain of the Deficiencies I reviewed— for which Houserman was not responsible—could have clearly been rated as Significant Deficiencies if Comtech had evaluated those Deficiencies the same way Comtech evaluated Houserman's alleged override of internal controls (of course, in my opinion, the way Comtech evaluated Houserman's alleged override of internal controls was inappropriate).

114.   I have discussed above why, in my opinion, Houserman did not override internal controls in SST that was listed by Comtech as a Significant Deficiency; rather, what transpired was a dysfunctional communication breakdown of Comtech executive management in dealing with a very logical question and observation by Houserman to Kornberg, Porcelain and others.  I have seen no evidence that would indicate to me that Houserman was committing fraud, hiding information, manipulating recording of revenue, falsifying vendors, or engaging in any of the other myriad of possible fraudulent activities that would alarm an auditor.  All Houserman was attempting to do was resolve what, in my opinion, was a poorly communicated, vague and illogical bonus process begging for a timely resolution which should have been simple to provide.  Indeed, from an auditing and accounting perspective, Houserman's conduct was a sign of strong internal controls to achieve the proper GAAP accounting.

115.   Plus, no matter what Houserman told him to do, as the top financial person in SST and the person with ownership of the financial statements flowing up to Comtech corporate for consolidation, Christensen had a responsibility to also get the correct facts—which

---

[113] TSYS009172; TSYS009191; TSYS069761; TSYS069824-069825; TSYS070606.

CONFIDENTIAL

he failed to do.  Notably, Christensen is not a trained accountant, nor a CPA (he has an undergraduate degree in general studies and holds an MBA),[114] yet Comtech corporate allowed him to be the top financial reporting person at SST in charge of financial statements feeding into the Comtech consolidation for SEC filings.  This in and of itself, in conjunction with the communication and responsiveness breakdown at Comtech corporate, is a major issue in this situation at the feet of Kornberg and Porcelain.  Houserman, who is not an accountant, should not be accused of overriding internal controls when, if anyone at SST, it was the Vice President, Finance who demonstrated incompetence in this situation by failing to demonstrate the essence of strong financial reporting skills closely intertwined with Comtech corporate accounting.

116.    In my opinion, the Significant Deficiency was possibly the breakdown between Comtech corporate and the accounting and record keeping functions at SST, which were operated by Christensen, as demonstrated by the evidence I have reviewed in my work.  It was not an override of internal controls that was driving the issue and that led to Houserman's termination.   Granted an adjustment was eventually directed by corporate, which SST complied with, but that could have been avoided during the second quarter of Fiscal 2018 when Houserman first attempted to resolve this issue with Kornberg.  Furthermore, the issue was first raised by Houserman and Christensen in the Quarterly Checklist for the first quarter of Fiscal 2018 which fell on deaf ears at Comtech corporate either because they ignored the comments in the Quarterly Checklist or never focused on its meaning—such a comment in the first quarter Fiscal

---

[114] LinkedIn profile Jason Christensen, July 13, 2020.

CONFIDENTIAL

2018 Quarterly Checklist should have trigged immediate action by Comtech corporate executive management.

*Comtech attempted to push the harsh action taken against Houserman to Deloitte by ascribing the identification of the alleged overriding of internal controls and Significant Deficiency to Deloitte when, in fact, such identification was that of Comtech and Deloitte, as expected under auditing protocol, accepted the decision.*

117.   An initial draft of the Audit Committee minutes for the March 6, 2018 meeting reflected the following wording: "Deloitte indicated that during its quarterly review and interim audit procedures, it became aware that the SST President intentionally overrode Company policy and procedures . . . ." Deloitte representatives wanted to change that wording to, "Deloitte indicated that during its quarterly review and interim audit procedures, *Corporate management had identified and made Deloitte* [emphasis added] aware that the SST President intentionally overrode Company policy and procedures . . ."[115] Also, an initial draft stated, "Deloitte informed the Audit Committee that this intentional override initially caused the monthly financial statements of the Company to be inaccurate . . ." which Deloitte wanted changed to "*As a result,* [emphasis added] this intentional override initially caused the monthly financial statements of the Company to be inaccurate . . . ."[116] Further, the Deloitte audit partner noted that he had revised the draft minutes to make explicit that Comtech management identified the internal control issue and informed Deloitte.[117]   However, the Audit Committee did not make these changes.  In my opinion, Deloitte was appropriately

---

[115] DT 0001013.
[116] DT 0001013.
[117] DT 0001040-0001042.

making changes to the minutes to reflect the reality of Comtech identifying the alleged policy and procedure, or internal control, issue,[118] not Deloitte.

118.   This is further demonstrated in the termination letter sent by Kornberg to Houserman dated April 2, 2018 which states, "By overriding Comtech's established financial reporting processes . . . you have . . . caused . . .  Deloitte & Touche LLP . . . to report . . . SST's monthly financial statements were not in conformity with . . . GAAP . . . and that your conduct caused . . . a significant deficiency in . . . compliance with internal control over financial reporting . . .."[119]  One of Deloitte's representatives noted that Deloitte does not audit at the business unit level, meaning SST, and, thus, cannot access or report on the business unit's compliance with GAAP and Deloitte does not audit monthly financial statements; rather, the audit is of Comtech's consolidated financial statements for the entire year.  The Deloitte representative recommended deleting that reference.[120]  Of course, this was not deleted from the letter and was misleading as to Deloitte's responsibility and, in my opinion, again reflects that Comtech was perhaps inappropriately attempting to shift the action it took against Houserman to Deloitte.

119.   Deloitte did not disagree with the wording of the minutes of the March 6, 2018 Audit Committee meeting that stated Deloitte indicated during the meeting that the proposed plan to terminate Houserman appeared appropriate.  Sarno clarified, however, that termination was not the only possible remediation step and there were other appropriate actions that could have been taken.[121]  Thus, Deloitte was not calling for the termination of Houserman.

---

[118] Michael Porcelain Deposition, July 29, 2020, at 263.
[119] TSYS038822-038825.
[120] TSYS025150; John Sarno Deposition, July 22, 2020, at 138-139.
[121] John Sarno Deposition, July 22, 2020, at 170-172; TSYS025148.

CONFIDENTIAL

120.    Deloitte did conclude that the alleged override of internal controls by Houserman and related inappropriate accounting by Christensen was a Significant Deficiency in ICFR.[122]  This does not surprise me as independent auditors typically accept the internal controls decisions regarding Deficiencies made by clients and do not reduce a Significant Deficiency or Material Weakness to a Deficiency.  Of course, independent auditors may add to the list of Deficiencies or increase a Deficiency to a Significant Deficiency or Material Weakness.

121.     However, to again emphasize an important point I made above, it appears that Deloitte must not have been provided with the full set of relevant documents to properly analyze this issue, as *Sarno testified that, if Houserman had believed that the Fiscal 2018 Goal Sheet contained an error, and if Houserman had been requesting resolution of this issue from management without any response until Kornberg stated on February 13, 2018 that the Goal Sheet was correct, it would not have been a control Deficiency for her to instruct Christensen to accrue for the higher bonus amount.*[123]   It is also important to note that Deloitte concluded, based on its expanded audit procedures, that the identified situation was not pervasive throughout the SST business unit and was limited to the one occurrence identified.[124]  In my opinion, this provides further support, in conjunction with my expanded procedures, that Houserman did not override internal controls of SST given her other management performance in SST was not found problematic.  It simply raises the question of why there was a drive by Comtech to find

---

[122] DT 0000396-0000401.
[123] John Sarno Deposition, July 22, 2020, at 245-246.
[124] DT 0000396-0000401.

CONFIDENTIAL

that Houserman was overriding internal controls in view of the preponderance of contradicting evidence.

*In my opinion, Houserman's actions did not warrant a conclusion that she overrode internal controls of Comtech. Houserman's actions were entirely appropriate and part of a healthy internal controls process calling for top management timely dialogue to ultimate resolution rather than an unfounded, knee jerk reaction by Comtech executive management given the confusion, errors, lack of understanding and timely candor demonstrated by such management.*

122.    In my opinion, based on my review and consideration of the various documents, I firmly believe Houserman did not override internal controls as alleged by Comtech leading to her termination. What I determined was that a dysfunctional Comtech management team lacking in leadership and with a poor tone at the top failed to get the 2018 bonus issue resolved, even though Houserman had been pursuing it for months. This issue could have been resolved very quickly by Kornberg and his team, but they elected not to do so for whatever reason. The overriding of internal controls was not at the hands of Houserman but, unfortunately, she was the victim of weak governance demonstrated by Comtech executive management.

### *Right to Update and Supplement*

123.    I reserve the right to update or amend this report as new information becomes available or is brought to my attention up to the point of my intended testimony.

Respectfully submitted,

_____                                                          August 14, 2020

Gary B. Goolsby

Appendix 1 Curriculum Vitae



# Gary B. Goolsby, CPA*

Senior Managing Director
Forensic & Litigation Consulting

1301 McKinney Street, Suite 3500 – Houston, TX 77010
+1 713 353 5442
Gary.Goolsby@fticonsulting.com

**Education**

B.S., Accounting, Louisiana Tech University
M.B.A., Louisiana Tech University

**Certifications**

Certified Public Accountant, Texas and Louisiana (CPA)
Certified in Financial Forensics (CFF)

**Associations**

Associate Member of American Bar Association
American Institute of Certified Public Accountants
Member of International Bar Association
Texas Society of Certified Public Accountants

Gary Goolsby has 46 years of experience in accounting and auditing, risk management, resolving auditor malpractice allegations, investigations, governance, internal controls and business processes, board of directors and regulatory interactions, executive management, expert witness testimony and case consultancy and technical presentations.

Mr. Goolsby has provided professional services to many industries including oil and gas exploration, development, services, refining; mining; financial institutions including brokerage, banks, savings and loans, mortgage banking, insurance; healthcare; construction and real estate. In addition to serving clients in North America, Mr. Goolsby has experience on a global basis assisting with business and regulatory issues in Asia, Europe and Latin America. He has also served on various U.S. and global committees with representatives from other major professional services firms focusing on ethics, banking, financial reporting, auditing and risk management issues. Mr. Goolsby has made numerous presentations during his career covering a wide range of financial reporting, risk and investigation issues. He has also previously served as liaison to the Professional Liability Litigation and Energy Litigation Committees of the American Bar Association Section of Litigation.

Mr. Goolsby's experience includes involvement in the resolution of various business, accounting, auditing or disclosure issues relating to, among others, revenue recognition, going concern and liquidity, whistleblower allegations, alleged fraud, management integrity and credibility, fraudulent transfers, purchase accounting, retirement plans, financial instruments, stock options, loan loss reserves, inventory, income taxes, forecasts, bank asset/liability management, financial institution regulatory capital requirements, governance, internal control weaknesses, SEC and financial institution regulatory filings, alleged illegal acts (including anti-corruption) and various types of contingencies. This experience was gained during many crisis periods including the banking, savings and loan and real estate difficulties in the late 1980s and early 1990s; oil and gas industry downturn during the mid-1980s; Asian real estate and financial crisis during the late 1990s; Mexico peso valuation issues during the mid-1990s; bull and dot com market during the late 1990s and financial crisis during the late 2000s. Mr. Goolsby has met frequently with audit committees, boards of directors, Department of Justice, Securities and Exchange Commission and financial institution regulators, discussing these various issues.

Mr. Goolsby's investigation experience includes, among others, investigating inappropriate accounting for income taxes; pricing of crude oil sales between affiliated parties; identification of use of funds by a borrower; tracing of crude oil transactions preceding bankruptcy; Ponzi scheme transactions; inappropriate use of investor funds for condominium project; accounting irregularities related to transactions of a company in China; transactions of U.S. energy companies with other non-U.S. companies; claims related to political risk insurance; accounting irregularities related to revenue recognition; oil and

*FTI Consulting is not a CPA firm

**EXPERTS WITH IMPACT™**



gas partnership accounting; inappropriate behavior by management; misleading forward guidance; violations of anti-corruption regulations including Foreign Corrupt Practices Act, sanction country and United Nations Iraq Oil for Food Program; and inappropriate accounting for granting and pricing of employee stock options. These engagements have involved analyzing company documents; understanding company internal controls and processes; tracing of transactions; interviewing personnel; and interacting with and making presentations to company executive management, internal and external auditors, audit and special committees of the board of directors, Securities and Exchange Commission Enforcement Division, Office of Foreign Asset Control and Department of Justice.

He has also provided expert reports, affidavits and testimony in federal and state courts and in U.S. and international arbitrations relating to insolvency, theft of confidential business information, goodwill accounting, validity of accounts receivable, fraudulent transfers, auditor professional malpractice, governance, internal controls and processes, bank loans, construction bidding processes, accounting for LNG, liquidity and creditworthiness, post-acquisition transaction disputes, accounting for intercompany transactions and investments, tracing of cash for potential asset freeze and accounting for and tracing of hydrocarbon products. He has provided expert consultation on various cases including auditor professional malpractice.

Prior to joining FTI Consulting, Mr. Goolsby was a Managing Director for 5 years in the Disputes and Investigations practice of Navigant Consulting. Prior to Navigant Consulting, he served in executive level positions of Chief Financial Officer and President for a Houston financial services company.

Mr. Goolsby was with Arthur Andersen for 28 years, 18 as a partner, serving in various audit partner and leadership roles including:

• Audited companies in oil and gas, brokerage, banking, S&Ls, mortgage banking, insurance, real estate, mining.

• Responsibilities evolved over the years serving in the following roles during different periods:

  – Financial Markets Audit Practice Director for the Americas and Global Risk Manager for Depository Institutions.

  – Firm-wide Audit Practice Director for Houston and San Antonio covering all industries.

  – Managing Audit Practice Director for the Americas covering all industries with about 15 Practice Directors reporting to him.

  – Global Managing Audit Practice Director covering all industries with about 30 Practice Directors reporting to him.

  – Managing Partner Global Risk Management for the entire firm, covering all service categories, with about 100 Practice Directors reporting to him.

• The various Practice Director/Managing Partner roles included responsibilities for all industries covering audit methodology and scope of work, financial reporting accounting and disclosure issues, appropriate audit report, going concern, independence issues, engagement acceptance and resignations, partner evaluations, audit malpractice allegations against the firm, etc.

• Served on numerous Arthur Andersen committees; involved in negotiations with the SEC and FDIC on various audit matters; made numerous presentations on accounting, auditing and risk management issues; served on AICPA Ethics Executive Committee for 3 years (Chaired the Independence Behavioral Standards Sub-Committee in AICPA Ethics Division for 3 years); served on AICPA Banking Committee for 4 years; served as Arthur Andersen's representative on Global Risk Committee and Global Steering Committee comprised of 7 largest global audit firms; among others

**Relevant Experience**

Expert Consulting and Investigations

• Expert consultant regarding investigation of compliance with provisions of lender's loan agreements by a borrower in the oil and gas exploration and production business.

• Expert consultant regarding the accounting for the spin-off of a separate service business from its parent company in the oil and gas service industry.



Gary B. Goolsby

- Expert consultant regarding investigation of actions of CFO relating to certain loan covenant financial calculations.

- Expert consultant regarding determination of royalty revenue base relating to patent dispute between two international oil and gas service companies.

- Expert consultant regarding investigation of intercompany transfers of assets of an entity to other affiliates and resulting implications on existing loan agreements.

- Expert consulting for the unsecured creditors' committee regarding intercompany activities between certain debtor and non-debtor entities in a bankruptcy.

- Expert consultant regarding analysis of travel and entertainment expenses incurred by executives of an oil and gas exploration and production company.

- Expert consultant regarding a Ponzi scheme investigation including extensive forensic analysis of transactions with victims.

- Expert consulting regarding the denial by an insurance carrier of directors and officers insurance coverage for an oil and gas service company relating to certain anti-corruption issues.

- Expert consultant regarding investigation of allegations relating to certain inventory issues for a public retail company.

- Expert consultant regarding internal controls over procurement relating to allegations of improper payments pursuant to the Foreign Corrupt Practices Act for an international oil and gas company, responding to an inquiry by the Securities and Exchange Commission, including meeting with the Securities and Exchange Commission.

- Expert consultant regarding transactions relating to construction of a refinery by an international oil and gas company responding to an inquiry by the Securities and Exchange Commission, including meeting with the Securities and Exchange Commission.

- Expert consultant regarding damages relating to allegations of wrongful termination of a company's president.

- Expert consultant regarding certain allegations relating to bidding of construction contracts and use of funds by an educational institution.

- Expert consultant regarding testing and analysis of crude oil prices, freight charges and procurement procedures for certain refinery operations.

- Expert consultant regarding certain earnout provisions relating to an acquisition by a refinery operation.

- Expert consultant regarding allegations of violations of accounting provisions of representations, warranties or covenants included in a sale and purchase agreement for a portion of a U.S. public company purchased by a foreign entity.

- Expert consultant regarding a special investigation of travel and entertainment expenses incurred by the CEO of a company.

- Expert consultant regarding a special investigation of certain costs and expenses incurred by a borrower relating to a troubled loan from an investor.

- Expert consultant regarding auditor malpractice issues relating to an audit in the financial services industry.

- Expert consultant regarding Big 4 auditor (two partners and a manager) malpractice issues relating to an audit in the real estate industry.

- Expert consultant regarding auditor malpractice issues relating to an audit in the investment fund industry.

- Expert consultant regarding auditor malpractice issues relating to an audit of a government contractor.

- Expert consultant relating to anti-corruption compliance and investigation issues in Mexico for a public international company.



Gary B. Goolsby

- Expert consultant regarding anti-corruption analyses of transactions and related activities in Mexico of certain subcontractors of a public international oil and gas service company.

- Expert consultant regarding an SEC Enforcement matter relating to certain business transactions of a company in China.

- Expert consultant relating to certain oil and gas product transactions of U.S. energy companies with other non-U.S. companies.

- Expert consultant in a special investigation relating to Foreign Corrupt Practices Act matters in Angola for a public international oil and gas service company.

- Expert consultant relating to use of investor funds for investment in a condominium project.

- Expert consultant regarding analysis of transactions of an oil and gas partnership for consistency with partnership agreement.

- Expert consultant to an insurance company relating to analyses of two political risk insurance claims submitted by a public international oil and gas company.

- Expert consultant to a public international oil and gas company relating to an analysis of a political risk insurance claim submitted to an insurance company.

- Expert consultant regarding accounting for income taxes in a special investigation of whistleblower allegations for a public international company.

- Expert consultant regarding appropriate basis of accounting for certain oil and gas producing properties.

- Expert consultant relating to a borrower's allegations against a significant U.S. bank regarding a loan for nursery plants and flowers.

- Expert consultant in a special investigation relating to allegations of misleading forward guidance by a public real estate company.

- Expert consultant regarding losses in oil and gas investments in the U.S. experienced by certain foreign investors.

- Expert consultant to the Securities and Exchange Commission regarding violations of the Foreign Corrupt Practices Act by a U.S. registrant.

- Expert consultant in a special investigation relating to authorization, granting and pricing of employee stock options for a public software company.

- Expert consultant in a special investigation relating to authorization, granting and pricing of employee stock options for a public oil and gas service company.

- Expert consultant in a special investigation relating to authorization, granting and pricing of employee stock options for a public specialty environmental company.

- Expert consultant in a special investigation relating to Foreign Corrupt Practices Act matters for a public international oil and gas service company.

- Expert consultant in a special investigation relating to the United Nations Oil for Food Program for a public international company.

- Expert consultant in a special investigation relating to sanctioned country matters for a public international company.

- Expert consultant in a special investigation relating to a revenue restatement issue for a public company in the oil and gas services industry.

- Expert consultant regarding enhancing processes and internal controls for a large oil refiner.



Gary B. Goolsby

Financial Consulting

- Involved in the resolution of various business, accounting, auditing or disclosure issues relating to a wide range of financial matters including, among others, auditor malpractice, revenue recognition, going concern and liquidity, alleged fraud, management integrity and credibility, purchase accounting, retirement plans, income taxes, inventory, financial instruments, stock options, loan loss reserves, forecasts, bank asset/liability management, financial institution regulatory capital requirements, governance, internal control weaknesses, SEC and financial institution regulatory filings, alleged illegal acts (including anti-corruption), various types of contingencies and appropriate audit reports. Various industries involved including oil and gas exploration, development, services, refining; financial institutions including brokerage, banks, savings and loans, mortgage banking, insurance; construction and real estate.

- Frequent meetings with audit committees, boards of directors, Department of Justice, Securities and Exchange Commission and financial institution regulators discussing various issues.

Expert Reports/Testimonies/Affidavits

- Expert reports, deposition and trial (before Administrative Law Judge) testimonies regarding Big 4 audit partner malpractice issues relating to an audit in the investment industry, March, April and May 2017.  SEC Administrative Proceeding File No. 3-17651.

- Expert reports, deposition and arbitration testimonies regarding Big 4 auditor malpractice issues relating to an audit in the investment industry, February, March, April and May 2015.

- Expert report and deposition testimony regarding Big 4 auditor malpractice issues relating to an audit in the international oil and gas industry, May and June 2016.

- Expert reports regarding auditor malpractice allegations by a banking regulator relating to an audit of a bank, October and December 2017, and meeting with the banking regulator to discuss the expert reports, January 2018.

- Expert designation, including opinions for interrogatory responses, and deposition testimony in state court regarding auditor malpractice issues relating to an audit in the investment industry, October 2015, February and March 2016.

- Expert affidavit, expert report, deposition and arbitration testimonies regarding auditor malpractice issues relating to an audit in the life insurance industry, November 2017, March, June and August 2018.

- Affidavit regarding obtaining documents in discovery consistent with those needed in conducting an audit in accordance with Generally Accepted Auditing Standards.

- Expert report and deposition testimony relating to purchases and sales of crude oil and related priority of loan payments to a bank rather than to producers of crude oil by a company that ultimately filed for bankruptcy, June and July 2018.

- Expert report and trial testimony relating to receivables due from a municipality relating to services rendered by a company providing disaster relief administrative assistance, June and September 2018.  CDM Smith Inc. v. City of Galveston and Sterling W. Patrick, Director, Department of Grants and Housing, District Court of Galveston County, Texas, 56th Judicial District, Cause No. 13-CV-0844.

- Expert report and deposition testimony relating to organizational, operational and accounting characteristics of an oil and gas exploration and production subsidiary within a corporate structure regarding calculation of royalty payments on sales of oil, natural gas and natural gas liquids, December 2018 and January 2019.

- Expert designation and deposition testimony in state court regarding bidding processes of an international construction company relating to an oil and gas production facility, February and March 2019.

- Expert report and deposition testimony regarding accounting for impairment of goodwill and preparation of forward earnings guidance relating to a publicly owned hospital, October and December 2019.

- Expert designation in municipal court regarding billing processes, invoice support, audit rights and contract damages pursuant to a services agreement of a vendor with its client.



Gary B. Goolsby

- Expert report for international arbitration relating to allegations of violations of corruption and accounting provisions of representations and warranties included in a share purchase and sale agreement for the sale of a company in a foreign country, November 2017.

- Expert report and testimony before Tribunal for ICC international arbitration relating to availability of funds and credit creditworthiness of the buyer regarding the failed consummation of a purchase in a foreign country, February and March 2020.

- Expert report and Federal Court preliminary injunction trial testimony regarding tracing of cash and related tracing methodologies relating to alleged inappropriate use of cash received by a contractor from a customer and attempt to freeze assets of the contractor, May and June 2020.  Toshiba International Corporation v. Sudhakar Kalaga, et al, United States District Court for the Southern District of Texas Houston Division, No. 4:19-cv-04274.

- Expert report, deposition and Federal Court trial testimonies in areas of fraudulent transfers, reasonably equivalent value, liquidity, insolvency and use of lender funds relating to oil and gas drilling rig program, 2007-2008.  Biliouris, et al v. Sundance Resources Inc., et al, Texas Northern District Court, No. 3:2007cv01591.

- Expert reports, deposition and arbitration testimonies relating to accounting for hydrocarbon products, July, August, September and October 2013.

- Expert report and deposition testimony regarding governance, internal controls and processes in anti-corruption litigation against former executive of public company, 2014.  Securities and Exchange Commission v. Mark A. Jackson and James J. Ruehlen, United States District Court, Southern District of Texas, Houston Division, No. 4:12-cv-00563.

- Expert report, witness affidavit, deposition and trial testimonies regarding certain alleged damages relating to the purchase of a fuel oil supply operation, February, March and November 2017.  Aegean Marine Petroleum Network Inc. and Aegean Bunkering (USA) LLC v. Hess Corporation, Supreme Court of the State of New York, County of New York, Index. No. 653887/2014.

- Expert reports and deposition testimony regarding certain damages and related party transactions relating to an investment in certain real estate operations of a public company, September 2015, February, September, October and December 2017.

- Expert reports regarding insolvency determinations relating to a company in the financial services industry that ultimately filed for bankruptcy, December 2017 and February 2018.

- Expert report and declaration regarding insolvency determination on a GAAP basis relating to audit committee decisions for a company in the financial services industry that ultimately filed for bankruptcy, July and August 2018.

- Expert designation in state court regarding bank lending practices for a residential real estate loan, August 2018.

- Expert reports regarding certain damages relating to theft of confidential marketing and financial information of a lending institution, July and November 2016.

- Expert report regarding certain damages relating to theft of customer information and loan practices of a lending institution, February 2019.

- Expert report regarding certain damages relating to theft of customer information of a lending institution, September 2017.

- Expert report regarding certain damages relating to financial transactions of an energy trading company with a financial institution, October 2014.

- Expert report regarding internal controls applicable to capitalized oil and gas exploration costs for a public oil and gas company relating to an inquiry by the Securities and Exchange Commission, November 2016.



Gary B. Goolsby

**Publications**

- Investigations Quarterly, Navigant Consulting, "Mining Wall Street, What's In Store for 2007 and Beyond," with John Geron, March 2007.



## Appendix 2 - Information Considered

Court Filings
TeleCommunications Systems, Inc. v Lynne Houserman Complaint
TeleCommunications Systems, Inc. v Lynne Houserman Defendant's Answer to Complaint and Affirmative Defenses
Lynne Houserman v Comtech Telecommunications Complaint
Lynne Houserman v Comtech Telecommunications First Amended Complaint
Lynne Houserman v Comtech Telecommunications Defendants' Answer to Complaint
Lynne Houserman v Comtech Telecommunications Defendants' Answer and Affirmative Defenses to Defendants' Counterclaims

Depositions
Lynne Houserman Deposition, November 21, 2019 and Exhibits
John Sarno Deposition, July 22, 2020 and Exhibits
Nicole Eichberger Deposition, July 23, 2020 and Exhibits
Michael Porcelain Deposition, July 29, 2020 and Exhibits
Fred Kornberg Deposition, July 30, 2020 and Exhibits (Day 1)
Rough Draft of 30(b)(6) Tricia Sheehan Deposition, August 13, 2020

Bates Referenced Documents

| | |
|---|---|
| DT 0000371 | DT 0000979 |
| DT 0000372 | DT 0001000 |
| DT 0000379 | DT 0001001 |
| DT 0000380 | DT 0001001 |
| DT 0000384 | DT 0001010 |
| DT 0000385 | DT 0001012 |
| DT 0000388 | DT 0001013 |
| DT 0000389 | DT 0001014 |
| DT 0000392 | DT 0001015 |
| DT 0000396 | DT 0001035 |
| DT 0000402 | DT 0001039 |
| DT 0000411 | DT 0001040 |
| DT 0000439 | DT 0001043 |
| DT 0000566 | DT 0001045 |
| DT 0000589 | DT 0001046 |
| DT 0000593 | DT 0001047 |
| DT 0000639 | DT 0001051 |
| DT 0000655 | DT 0001054 |
| DT 0000662 | DT 0001057 |
| DT 0000742 | DT 0001059 |
| DT 0000816 | DT 0001060 |
| DT 0000834 | DT 0001083 |
| DT 0000851 | DT 0001084 |
| DT 0000864 | DT 0001105 |
| DT 0000868 | DT 0001106 |
| DT 0000966 | DT 0001108 |
| DT 0000968 | DT 0001129 |
| DT 0000969 | DT 0001130 |
| DT 0000973 | DT 0001151 |
| DT 0000976 | DT 0001153 |
| DT 0000977 | DT 0001161 |
| DT 0000978 | |

**Appendix 2 - Information Considered**

| | |
|---|---|
| Eichberger00010 | Eichberger00216 |
| Eichberger00020 | Eichberger00297 |
| Eichberger00022 | Eichberger00299 |
| Eichberger00024 | Eichberger00303 |
| Eichberger00026 | Eichberger00308 |
| Eichberger00028 | Eichberger00488 |
| Eichberger00074 | Eichberger00570 |
| Eichberger00096 | Eichberger00572 |
| Eichberger00145 | Eichberger00604 |
| Eichberger00175 | Eichberger00659 |
| Eichberger00177 | Eichberger00663 |
| Eichberger00180 | Eichberger00806 |
| Eichberger00182 | Eichberger01190 |
| Eichberger00184 | Eichberger01214 |
| Eichberger00197 | Eichberger01242 |
| Eichberger00201 | Eichberger01350 |
| Eichberger00208 | Eichberger01357 |

HOUSERMAN0000640
HOUSERMAN0000756

| | |
|---|---|
| PwC000001-139 | PwC000582 |
| PwC000142 | PwC000645 |
| PwC000246 | PwC000749 |
| PwC000268 | PwC000943 |
| PwC000276 | PwC001027 |
| PwC000279 | PwC001100 |
| PwC000286 | PwC001274 |
| PwC000366 | PwC000645 |
| PwC000384 | PwC000749 |
| PwC000390 | PwC001501 |
| PwC000509 | PwC001506 |

| | |
|---|---|
| TSYS000500 | TSYS041258 |
| TSYS000502 | TSYS041264 |
| TSYS000757 | TSYS041276 |
| TSYS000757 | TSYS041288 |
| TSYS000945 | TSYS041289 |
| TSYS001232 | TSYS041292 |
| TSYS003652 | TSYS041293 |
| TSYS003653 | TSYS041294 |
| TSYS003664 | TSYS041295 |
| TSYS003946 | TSYS041299 |
| TSYS005376 | TSYS041300 |
| TSYS006375 | TSYS041310 |
| TSYS006378 | TSYS041312 |
| TSYS006385 | TSYS041363 |
| TSYS006723 | TSYS041364 |
| TSYS006726 | TSYS044793 |
| TSYS006728 | TSYS044803 |
| TSYS007555 | TSYS044804 |
| TSYS007590 | TSYS044808 |
| TSYS007593 | TSYS047105 |

**Appendix 2 - Information Considered**

| | |
|---|---|
| TSYS009143 | TSYS047106 |
| TSYS009146 | TSYS048439 |
| TSYS009159 | TSYS048448 |
| TSYS009172 | TSYS048550 |
| TSYS009173 | TSYS048553 |
| TSYS009191 | TSYS049438 |
| TSYS009205 | TSYS049439 |
| TSYS010597 | TSYS053154 |
| TSYS010910 | TSYS053179 |
| TSYS010912 | TSYS053179 |
| TSYS010913 | TSYS053458 |
| TSYS010914 | TSYS053459 |
| TSYS010920 | TSYS053460 |
| TSYS012775 | TSYS053461 |
| TSYS012864 | TSYS053469 |
| TSYS013046 | TSYS053470 |
| TSYS013048 | TSYS055553 |
| TSYS013086 | TSYS055554 |
| TSYS013394 | TSYS057848 |
| TSYS013395 | TSYS057872 |
| TSYS014381 | TSYS057890 |
| TSYS014462 | TSYS062420 |
| TSYS014483 | TSYS062421 |
| TSYS014485 | TSYS062427 |
| TSYS014491 | TSYS062434 |
| TSYS014492 | TSYS062500 |
| TSYS014495 | TSYS062674 |
| TSYS014507 | TSYS062675 |
| TSYS014667 | TSYS062676 |
| TSYS016507 | TSYS062677 |
| TSYS017170 | TSYS062678 |
| TSYS019747 | TSYS062726 |
| TSYS019750 | TSYS062749 |
| TSYS019778 | TSYS062750 |
| TSYS019795 | TSYS062753 |
| TSYS020129 | TSYS062812 |
| TSYS020130 | TSYS062960 |
| TSYS020132 | TSYS062963 |
| TSYS020133 | TSYS062971 |
| TSYS021888 | TSYS062972 |
| TSYS022505 | TSYS062973 |
| TSYS022509 | TSYS062975 |
| TSYS022524 | TSYS062981 |
| TSYS022527 | TSYS062993 |
| TSYS022589 | TSYS063001 |
| TSYS022603 | TSYS063109 |
| TSYS022604 | TSYS063148 |
| TSYS023706 | TSYS063172 |
| TSYS023722 | TSYS063190 |
| TSYS023749 | TSYS063227 |
| TSYS023750 | TSYS063282 |
| TSYS023818 | TSYS063285 |
| TSYS023885 | TSYS063294 |

**Appendix 2 - Information Considered**

| | |
|---|---|
| TSYS024099 | TSYS063313 |
| TSYS024293 | TSYS063729 |
| TSYS024642 | TSYS063730 |
| TSYS024643 | TSYS069761 |
| TSYS024649 | TSYS069824 |
| TSYS024650 | TSYS069992 |
| TSYS025041 | TSYS069999 |
| TSYS025042 | TSYS070606 |
| TSYS025044 | TSYS070715 |
| TSYS025049 | TSYS070730 |
| TSYS025057 | TSYS070740 |
| TSYS025058 | TSYS070791 |
| TSYS025116 | TSYS070791 |
| TSYS025117 | TSYS070806 |
| TSYS025124 | TSYS071235 |
| TSYS025136 | TSYS072040 |
| TSYS025137 | TSYS072043 |
| TSYS025144 | TSYS072045 |
| TSYS025146 | TSYS072315 |
| TSYS025148 | TSYS074282 |
| TSYS025150 | TSYS074283 |
| TSYS025151 | TSYS074407 |
| TSYS025237 | TSYS074608 |
| TSYS025238 | TSYS074622 |
| TSYS025250 | TSYS076969 |
| TSYS025267 | TSYS077091 |
| TSYS025272 | TSYS078687 |
| TSYS025273 | TSYS078714 |
| TSYS030208 | TSYS078768 |
| TSYS037060 | TSYS078873 |
| TSYS037061 | TSYS078875 |
| TSYS037593 | TSYS078878 |
| TSYS037595 | TSYS078881 |
| TSYS037596 | TSYS078902 |
| TSYS037894 | TSYS079367 |
| TSYS037895 | TSYS079380 |
| TSYS037905 | TSYS079451 |
| TSYS037906 | TSYS079457 |
| TSYS038367 | TSYS079745 |
| TSYS038822 | TSYS079873 |
| TSYS040063 | TSYS079875 |
| TSYS040064 | TSYS079903 |
| TSYS040975 | TSYS079968 |
| TSYS040976 | TSYS079971 |
| TSYS041079 | TSYS079977 |
| TSYS041248 | TSYS080275 |
| TSYS041249 | TSYS080512 |
| TSYS041256 | TSYS080513 |

No Bates Referenced
SST PDO6 Accrual FY18.xlsx
Monthly Bonus Calculations FY17.xlsx
FY17 SOX Certification and Remediation Tracker.xlsx

## Appendix 2 - Information Considered

Forms 2342S – Evaluation of Deficiencies in Internal Controls.xlsx
Email from Steo to Christensen re FY17 SOX and SOBC Certification for SST
Miller Nash letter to Kornberg
Employment Agreement with TSYS
Amendment to Employment Agmt
Employment Agmt with Comtech
SST Control Testing Status Tracker
SST President's Report January 2018
Quarterly Financial and Disclosure Consideration Checklist for the Quarter Ended January 31, 2018


SEC Filings
Comtech Telecommunications Corporation, July 31, 2019 Form 10-K
Comtech Telecommunications Corporation, July 31, 2018 Form 10-K
Comtech Telecommunications Corporation, July 31, 2017 Form 10-K
Comtech Telecommunications Corporation, September 29, 2016 Form 8-K

Other Research
Internal Control—Integrated Framework issued by Committee of Sponsoring Organizations of the Treadway Commission (September 1992, amended May 1994)
Internal Control—Integrated Framework issued by Committee of Sponsoring Organizations of the Treadway Commission (May 2013).
SEC Release No. Rel.T.33-8238
AU Section 326.12
AU-C Section 265.06-.07
Statement of Financial Accounting Concepts No. 6:  Elements of Financial Statements, ACCRUAL ACCOUNTING
FASB Accounting Standards Codification, 275, Risks and Uncertainties, Use of Estimates (U.S. GAAP).
Managing the Business Risk of Fraud: A Practical Guide sponsored by The Institute of Internal Auditors, The American Institute of Certified Public Accountants and the Association of Certified Fraud Examiners

Quick Survey: SOX 302 Sub-Certification Practices          http://scsgp.informz.net/SCSGP/data/images/Alert%20Documents/Summary%20-%20SOX%20302%20Sub-Certification%20Practices.pdf

LinkedIn Profile Jason Christensen, July 13, 2020
Deloitte, Refocus your certification programs lens.  How to unlock hidden value, Copyright 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I, Erica Knerr, declare that I am employed by the law firm of Calfo Eakes LLP, a citizen

of the United States of America, a resident of the State of Washington, over the age of eighteen

(18) years, not a party to the above-entitled action, and competent to be a witness herein.

On August 14, 2020, I caused a true and correct copy of the Expert Reports of Mark A.

Gustafson and Gary B. Goolsby to be served on counsel listed below in the manner indicated:

Kathryn S. Rosen, WSBA #29465
Paula L. Lehmann, WSBA #20678
Kristina Markosova, WSBA #47924
Matthew Jedreski, WSBA #50542
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Phone: (206) 757-8134
Fax: (206) 757-7134
Email: katierosen@dwt.com
         paulalehmann@dwt.com
         kristinmarkosova@dwt.com
         mjedreski@dwt.com

☐ Via legal messengers
☐ Via first class mail
☐ Via facsimile
☑ Via email

*Attorneys for Telecommunication Systems,
Inc., Comtech Telecommunications
Corporation, Fred Kornberg, and Michael
Porcelain*

_____*s/ Erica Knerr*_____
Erica Knerr
Legal Assistant

CERTIFICATE OF SERVICE
Case Nos. 2:19-cv-00336-RAJ; 2:19-cv-00644-RAJ

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200   FAX (206) 407-2224