# EXHIBIT C

# Rough Draft of Elaine Lehnert

# Houserman v. Comtech Telecommunications Corporation, et al.

# November 12, 2020



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | **360.534.9066**     Spokane | **509.624.3261**     National | **800.846.6989**

email: info@buellrealtime.com



1   Q. Do you think your opinion in the Puffenger
2   matter was reliable?
3   A. Yes.
4   Q. What would you -- how would you characterize
5   the methodology that you used to come to conclusions in
6   the Puffenger matter? In other words, how did you go
7   about rendering your opinion -- I'm just talking about
8   the form. What did you do?
9   A. Well, I --
10      MS. GOODMAN: Object to form.
11  A. -- reviewed the documents that were provided to
12  me, which was the company's process. I believe it also
13  included the external auditor's work papers,
14  depositions, etc.
15  BY MR. CALFO:
16  Q. So one thing you did was gather information
17  about the circumstances relating to Ms. Puffenger's
18  claims; correct?
19  A. Yes. I reviewed the evidence that was provided
20  to me, yes.
21  Q. And that included depositions, did you say --
22  A. I believe it did, yes.
23  Q. It included documents that you'd received from
24  the company; correct?
25  A. Through counsel, yes.

1  Q. And you mentioned external audit work papers
2  that you reviewed; correct?
3  A. Yes.
4  Q. Did you try to gather as much information as
5  you could that would help render a reliable opinion --
6  A. Yes.
7  Q. -- based on the facts?
8  A. Yes.
9  Q. Once you had those facts, what did you do?
10 What methodology did you use to come to the conclusions
11 in your expert report in Puffenger?
12 A. So I used the COSO framework as my basis to
13 assess the internal controls and whether or not they
14 were in compliance with that framework.
15 Q. What else did you do?
16 A. I assessed the documentation that was provided
17 to make my determination.
18 Q. And did you draw upon your experience in the
19 area of internal controls to help form your opinions?
20 A. Well, my experience is my knowledge of COSO,
21 so -- so yes.
22 Q. Okay. And also your application of the COSO
23 framework in various settings that you had been in to
24 provide consultation and consulting; correct?
25 A. Yes.

1      Q. Are there other authoritative -- is there any
2  other authoritative literature that you look to in
3  evaluating tone at the top at a company?
4      A. I use the COSO framework.
5      Q. Is there any other authoritative literature you
6  would look to?
7      A. Me, personally? Not that I could think of.
8      Q. Do people -- are there publications that are
9  put out by respected members of the accounting community
10 relating to how to evaluate tone at the top?
11     A. I know that there are some -- when SOX was
12 being formulated there was a company called, I believe,
13 Protiviti, that has guidelines, and it's -- again, it's
14 not just specific to tone at the top. It's specific to
15 Sarbanes-Oxley, how you implement Sarbanes-Oxley, and
16 the components of COSO, which is a well recognized
17 standard framework that most companies in the U.S. do
18 use to evaluate their internal controls, so I believe
19 Protiviti has some guide -- guidance.
20     Q. In trying -- have you done -- do you try to do
21 things to stay abreast of current thinking on issues
22 relating to tone at the top?
23     A. I stay abreast of what's going on in the
24 internal control, again, arena, which is broader than
25 tone at the top. It's broader than control environment.

1   auditing world.

2       Q. Is there any that you've found particularly

3   helpful that you can identify for me?

4       A. Not off the top of my head.  They're all --

5   I -- they're all informative.

6       Q. In evaluating tone at the top does an external

7   auditor, you know, typically draw on his or her judgment

8   and experience?

9       A. Again, the external auditor is not evaluating

10  tone at the top.  That's not a criteria.  Their

11  evaluation is on internal controls over financial

12  reporting.  I believe there is a structure of how they

13  go about that.  Their expertise in -- would play into

14  that, but they're using a structure, and they are using

15  a recognized framework, and usually it is COSO.

16      Q. But I just -- I just want to make sure I

17  understand.  So in this instance Deloitte was Comtech's

18  external auditor; right?

19      A. Yes.

20      Q. And are you -- is -- are you saying -- again,

21  this is just so I understand the way it works.  You're

22  the expert, not me.  Does -- is it not one of Deloitte's

23  responsibilities to evaluate tone at the top at the

24  company in its capacity as an external auditor?

25          MS. GOODMAN:  Object to form.

1   A.  I think it depends on the facts and
2   circumstances.  That's a pretty general statement.
3   **Q.  Do you think there are times when it does not**
4   **involve an auditor's judgment, when they're coming to a**
5   **conclusion about whether there's an appropriate tone at**
6   **the top at a company?**
7   A.  Again, it's management's assessment.  That's
8   how the literature is -- it's management's assessment,
9   and they're opining on management's assessment.  So I'm
10  sorry, your question was?
11  **Q.  Well, I don't want to mince words.  I'm sure**
12  **you don't either.  But if the auditor, external auditor,**
13  **is performing an assessment of -- you know, relating to**
14  **tone at the top; correct?  They're assessing**
15  **management's assessment; correct?**
16  A.  Okay.  And the only reason why I'm -- I don't
17  mean to push back because the assessment is over
18  internal controls over financial reporting.  Tone at the
19  top is a small piece of the complete internal controls
20  over financial reporting.  And that's the only reason
21  why I just want to make sure that that's clear, that
22  they're not -- the assessment isn't on tone at the top.
23  The seam is over internal controls over financial
24  reporting.  I just want to make sure that's clear.
25  **Q.  Explain for me what you mean by the statement**

1  that tone at the top is a small part of what the auditor

2  does.

3      A.  There's a lot that they do, okay.  So when

4  they're assessing control environment, tone at the top

5  is one element of COSO.  And in -- in addition to that,

6  they're looking at the control activities, which is

7  another component of COSO.  They're looking at

8  reporting.  So I'm just saying that it's a piece of the

9  complete picture.  So they're not making -- you know,

10 their assessment is over the internal controls over

11 financial reporting.  That's -- that's all.

12     Q.  You used the word "small" component.

13     A.  Okay.  I shouldn't -- maybe I misspoke.  It's

14 an element.  It is an element.

15     Q.  And it's an important element; correct?

16     A.  Absolutely, absolutely.

17     Q.  And it's one of the things they do, is they

18 assess management's assessment of the tone at the top;

19 correct?

20     A.  They -- they look at that element, yes.

21     Q.  All right.

22     A.  I would think so.

23     Q.  And when they're making that assessment, do

24 they use judgment, their own judgment, in coming to that

25 assessment?

1   A.  Again, it's a combination of documentation that

2   they're reviewing, the company's documentation, and

3   their judgment, yes.  But they are looking -- it's not

4   their judgment alone.  The process is that you look at

5   the documentation supporting.  That's the process.

6         MR. CALFO:  Cindy, did you get that entire

7   answer?

8         THE COURT REPORTER:  Well, I think I should

9   read it back because she froze a couple different times.

10        THE WITNESS:  Oh, I'm sorry.

11        THE COURT REPORTER:  I don't know if words

12  were omitted, so let me just read the last sentence that

13  you said, that I got.  I have, "The process is that you

14  look at the documentation supporting.  That's the

15  process."

16        THE WITNESS:  You broke up.  I'm sorry.  Can

17  you read that back?  I can't hear you.

18        THE COURT REPORTER:  (Read back.)

19        THE WITNESS:  Okay.  You froze.  I'm sorry.

20        MR. CALFO:  Well, why don't we take a quick

21  break, and maybe if we all log back on, things will get

22  better.

23        THE VIDEOGRAPHER:  Okay.  One second.

24  Let's -- going off record.  Time now is 8:55 a.m.

25        (Recess from 8:55 a.m. to 9:08 a.m.)

1  haven't seen it.

2      Q.  Well, when you were evaluating his opinion and
3  suggesting it was incorrect, did you believe that his
4  opinion included an element that was that internal
5  controls are weakened if manage- -- well, excuse me.
6  Let me ask the question again.

7      When you were reviewing his report, did you
8  interpret him to mean that management should have the
9  ability to override internal controls at will?

10     A.  I'm saying that's what a management override
11 is.

12     Q.  All right.  When you read Mr. Goolsby's report,
13 did you interpret his opinion to mean that management
14 can override internal controls at will?

15     A.  I don't recall him having an opinion that says
16 that.

17     Q.  So you're not -- you're not attempting to
18 characterize Mr. Goolsby's opinion here as one in which
19 management can override controls at will, are you?

20     A.  I'm not stating that, no.  I'm stating that
21 internal controls are weakened if management has the
22 ability to override them at will.

23     Q.  And in the final sentence of Paragraph 13 you
24 say that "It is my opinion that Ms. Houserman's actions
25 compromised the company's internal control environment

1   by disregarding Comtech's standards of business
2   conduct."
3       Do you see that?
4       A.  Yes.
5       Q.  All right.  And is it part of your opinion in
6   this case that Ms. Houserman violated Comtech's
7   standards of business conduct?
8       A.  Yes.
9       Q.  And is it also your opinion that she violated
10  Comtech's policies and procedures?
11      A.  That's part of the policies and procedures,
12  yes.
13      Q.  And do you feel like you are in a position to
14  be able to opine on those things?
15      A.  Based on the information I received, yes.
16      Q.  And based on your experience?
17      A.  Yes.
18      Q.  Do you think your opinion that Ms. Houserman
19  violated Comtech policies and procedures is a reliable
20  opinion?
21      A.  Yes.
22      Q.  Do you think that your opinion that
23  Ms. Houserman disregarded Comtech's standards of
24  business conduct is a reliable opinion?
25      A.  Yes.

1  this Stan agreement as I've described?
2          MS. GOODMAN:  Object to the form.
3      A.  I mean, that sounds reasonable.
4  BY MR. CALFO:
5      Q.  And the parties to that agreement allegedly
6  were Stan Sloane, Jay Whitehurst, and Ms. Houserman.
7      Do you understand that?
8      A.  As you -- I don't have any belief not to belief
9  that's true.
10     Q.  And are you aware that all three of them deny
11 there was any such agreement to apply the reduction over
12 the five-year period?
13     A.  As you represent it to me, I have no reason not
14 to believe that.
15     Q.  Okay.  Is it a tone at the top issue, you
16 think, for Mr. Kornberg to falsely allege that there was
17 an agreement that her pre-tax profit should be reduced
18 by five years when there was no such agreement?
19     A.  I don't have an opinion one way or the other.
20     Q.  Is one of the issues you look at at tone at the
21 top the integrity and honesty and ethics of senior
22 management?
23     A.  Yes.
24     Q.  An if the CEO is lying about the existence of
25 an agreement that would affect a president's bonus

1  compensation, is that a tone at the top issue?

2          MS. GOODMAN:  Object to the form.

3      A.  Based on your hypothetical, if there was lying,

4  yes, that would affect the control environment, yes.

5  BY MR. CALFO:

6      Q.  Look at Paragraph 22.  There's a reference to

7  an email that Ms. Houserman forwarded to Mr. Kornberg

8  that outlined the impact of the SS T-bone us pool for

9  2017.

10         Are you familiar with that email?

11     A.  Yes.

12     Q.  And in response Mr. Porcelain wrote to

13 Mr. Kornberg and said that it was more complicated.

14         Do you see that?

15     A.  Yes.

16     Q.  And what's your understanding about why it was

17 more complicated, as Mr. Porcelain was implying?

18     A.  I don't know --

19         MS. GOODMAN:  Object to the form.

20     A.  I don't have an understanding one way or the

21 other about the complication that he was implying.

22 BY MR. CALFO:

23     Q.  Are you aware of the fact that Mr. Porcelain,

24 who was a CFO at the time, also contended that there was

25 a Stan agreement that required -- or that under which

1  Ms. Houserman agreed to have her profit before tax
2  reduced for a five-year period in the amount of $6.297
3  million?
4      A.  I -- as I sit here today --
5          MS. GOODMAN:  Object to the form.
6      A.  -- I don't recall that, but I'm assuming that
7  you're accurately assume rising your testimony -- the
8  testimony.  So I have no reason to disagree.
9  BY MR. CALFO:
10     Q.  If Mr. Porcelain was falsely claiming that
11 there was such a five-year agreement, that a tone at the
12 top issue?
13         MS. GOODMAN:  Object to the form.
14     A.  If he was lying, it could be, yes.
15 BY MR. CALFO:
16     Q.  How about if he failed to do adequate diligence
17 into whether there was such an agreement that affected
18 an executive's compensation?  Would that be a --
19         MS. GOODMAN:  Object to the form.
20 BY MR. CALFO:
21     Q.  -- a tone at the top issue?
22         MS. GOODMAN:  Object to the form.
23     A.  Can you clarify by "diligence"?  I'm sorry.
24 I'm not following.
25 ////

1  BY MR. CALFO:
2      Q.  He claims there was -- if he claimed there was
3  such an agreement, but failed to ask the right people
4  about whether there was one, he failed to do due
5  diligence into his assertion, would that be a tone at
6  the top issue?
7          MS. GOODMAN:  Object to the form.
8      A.  Again, I didn't do an evaluation of the --
9  that, but it -- you know, depending on the facts and
10 circumstances, it could be.
11 BY MR. CALFO:
12     Q.  Go to Paragraph 23, where you're discussing the
13 quarterly financial disclosure consideration checklist
14 that was submitted by Mr. Christensen and Ms. Houserman
15 on November 17, 2017.
16         You see that?
17     A.  I do.
18     Q.  And do you agree that the historical record
19 that you are basing your opinion on, that Ms. Houserman
20 and Mr. Christensen both stated that the general bonus
21 accrual calculation for Q1 contained -- included an
22 error?
23     A.  Yes, that's what it said.
24     Q.  And in that checklist Ms. Houserman is saying
25 that when corporate accounting required her to include

1   deficiency.

2   Q. Is upper management override a significant
3   deficiency?

4   A. No, usually they're material weaknesses, in my
5   experience.

6   Q. All right. Is every management override at
7   least a significant deficiency?

8   A. I've never seen a management override that
9   wasn't at least a significant deficiency.

10  Q. All right. And what factors go into
11  determining whether or not a -- some -- a deficiency is
12  a significant deficiency?

13  A. So it would be whether or not the deficiency
14  should be -- rise to the level where someone who
15  oversees the financial statements should be told,
16  meaning the audit committee.

17  Q. How does one decide that?

18  A. So there's guidelines. There's guidance. And
19  there's interpretive guidance under the SEC. But it is
20  based on the facts of the situation and -- and judgment.

21  Q. Is it possible that two reasonable auditors
22  would come to different conclusions on whether a
23  deficiency was a significant deficiency?

24      MS. GOODMAN: Object to the form.

25  A. I've seen where some believe it's a material