HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LYNNE HOUSERMAN,

                      Plaintiff,

   v.

COMTECH TELECOMMUNICATIONS
CORPORATION, FRED KORNBERG, AND
MICHAEL D. PORCELAIN

               Defendants.

TELECOMMUNICATION SYSTEMS, INC.,

                  Plaintiff,

v.

LYNNE HOUSERMAN AND MOTOROLA
SOLUTIONS, INC.,

               Defendants.

**CONSOLIDATED UNDER
NO. 2:19-CV-00644-RAJ**

NO. 2:19-CV-00336-RAJ
NO. 2:19-CV-00644-RAJ

ORDER ON LYNNE
HOUSERMAN AND MOTOROLA
SOLUTIONS INC.'S MOTION FOR
SUMMARY JUDGMENT AND
TELECOMMUNICATION
SYSTEMS, INC.'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

## I.  INTRODUCTION

Two motions are before this Court.  The first is a Motion for Summary Judgment filed by Lynne Houserman ("Ms. Houserman") and Motorola Solutions Inc. ("Motorola") (collectively "Defendants") in *Telecommunication Systems, Inc. v. Houserman and Motorola Solutions, Inc.*, Case No. 2:19-cv-00336-RAJ.  T-Dkt.[1] # 99.  The second is a

---

[1] "T-Dkt." refers to filings in *Telecommunication Systems*, while "H-Dkt." refers to filings in *Houserman*.

ORDER – 1

motion for partial summary judgment, filed a few days later, by TeleCommunication Systems, Inc. ("TCS" or "Plaintiff").  T-Dkt. # 111.  This case was subsequently consolidated with *Houserman v. Comtech Telecommunications Corp., et al.*, Case No. 2:19-cv-00644-RAJ, which was designated as the lead case on December 7, 2020.  H-Dkt. # 143.  The Court will address both motions in this order.

After reviewing the parties' briefs, the relevant case law, and the record, the Court finds that oral argument is unnecessary.  For the reasons below, the Court **DENIES in part** and **GRANTS in part** Defendants' motion for summary judgment.  T-Dkt. # 99.  The Court **DENIES** Plaintiff's motion for partial summary judgment.  T-Dkt. # 111.

## II.   BACKGROUND

Ms. Houserman served as the Senior Vice President and General Manager of the Safety and Security Technologies Group ("SST Group") at TCS, a provider of advanced communication solutions for governmental and commercial customers.  T-Dkt. # 99 at 8.  On September 6, 2014, she entered into an employment agreement with TCS for this role ("2014 Agreement").  T-Dkt. # 1 ¶ 45.  The agreement included a non-compete, a non-solicitation of clients, and a confidentiality agreement (collectively "restrictive covenants").  *Id.* ¶ 47-53.

When TCS was acquired by Comtech in February 2016, Ms. Houserman was offered and accepted a new position as the President of Comtech's SST Group.  T-Dkt. # 99 at 8; T-Dkt. # 101-4 at 3.  Her offer letter ("2016 Agreement") delineated her compensation, bonus eligibility, and vacation policy, among other conditions, but did not contain any non-compete or non-solicitation provisions.  T-Dkt. # 101-4 at 4.  It was signed by Ms. Houserman and Dr. Stanton Sloane, the Chief Executive Officer of Comtech at that time.  *Id.*  In her new role, she was responsible for emergency call routing and call handling services.  *Id.*  In August 2016, the call handling business was transferred to another division, and Ms. Houserman remained responsible only for call handling.  T-Dkt. # 99 at 8-9.

ORDER – 2

On April 2, 2018, Comtech terminated Ms. Houserman for cause.  T-Dkt. # 1 ¶ 71. Several months later, in August 2018, Ms. Houserman was hired by Motorola to serve as a Vice President overseeing Motorola's emergency call handling business.  T-Dkt. # 99 at 9.  On March 6, 2019, TCS filed a lawsuit against Ms. Houserman and Motorola.  TCS alleged four counts: (1) breach of contract against Ms. Houserman under Maryland law for violating the non-compete, non-solicitation of clients, and confidentiality provisions of her 2014 Agreement, T-Dkt. # 1 ¶¶ 103-112; (2) tortious interference with the 2014 Agreement against Motorola under Washington law, *id.* ¶¶ 113-119; (3) tortious interference with contractual relations against Motorola and Ms. Houserman under Washington law, *id.* ¶¶ 113-127; and (4) tortious interference with business expectancy against Motorola and Ms. Houserman under Washington law, *id.* ¶¶ 128-35.

Ms. Houserman and Motorola filed a motion for summary judgment on all claims. T-Dkt. # 99.  TCS then filed a motion for partial summary judgment on its first claim for breach of contract against Ms. Houserman and on its second claim for tortious interference with the 2014 Agreement against Motorola, as well as Motorola's affirmative defense of competition.  T-Dkt. # 111 at 6-7.

### III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets the initial burden, the

opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the nonmoving party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987). The court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (explaining that the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis original).

## IV. DISCUSSION

Defendants filed for summary judgment on all claims, including breach of contract based on violations of three restrictive covenants (non-compete, client non-solicitation, and confidentiality) and three tortious interference claims. The latter claims include (1) tortious interference with Ms. Houserman's 2014 Agreement against Motorola; (2) tortious interference with contractual relations with South Dakota against Motorola and Ms. Houserman; and (3) tortious interference with business expectancy with respect to General Dynamics Information Technology ("GDIT") against Motorola and Ms.

ORDER – 4

Houserman.  T-Dkt. # 99.

Plaintiff filed for summary judgment on the breach of contract claims, the tortious interference claim related to Ms. Houserman's 2014 Agreement, and Defendants' competition defense.  T-Dkt. # 111.  Plaintiff claims that there are genuine issues of material fact precluding summary judgment for the tortious interference claims related to South Dakota and GDIT.

### A.     Breach of Contract Claim

With respect to the breach of contract claim, both parties agree that based on Section 13 of the 2014 Agreement, Maryland law governs the Agreement.  T-Dkt. # 99 at 14; T-Dkt. # 111 at 17; T-Dkt. # 112-24 ¶ 13.  The Court concurs.  *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (holding that a federal court sitting in diversity looks to a forum state's choice of law rules); *see also McKee v. AT&T Corp*., 191 P.3d 845, 851 (Wash. 2008) (noting that Washington courts "generally enforce contract choice of law provisions with certain exceptions," none of which exist here).  The parties' agreement, however, ends here.

Defendants argue that they are entitled to summary judgment on the breach of contract claim for three reasons.  T-Dkt. # 99 at 14.  First, they argue that the restrictive covenants in the 2014 agreement are overbroad and thus invalid under Maryland law.  *Id.* Second, they claim that even if they are valid, the 2014 Agreement was superseded by the 2016 Agreement, which did not contain such restrictive covenants.  *Id.*  Third, they argue that even if the Court finds the 2014 restrictive covenants to be enforceable, Ms. Houserman did not breach them.  *Id.*  TCS, on the other hand, claims that it is entitled to summary judgment on its breach of contract claim because the 2014 Agreement is enforceable, and Ms. Houserman violated it as a matter of law.  T-Dkt. # 111 at 6-7.  The Court considers each argument in turn.

Under Maryland law, there are four elements that must be met for a restrictive covenant to be enforceable: (1) the employer must have a legally protected interest, (2)

the covenant must not be wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy. *Medispec, Ltd. v. Chouinard,* 133 F. Supp. 3d 771, 773 (D. Md. 2015) (citing *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 116 Fed. App'x. 435, 438 (4th Cir. 2004)). The "test used for a restrictive covenant in an employment contract is 'whether the particular restraint is reasonable on the specific facts.'" *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (citing *Ruhl v. F.A. Bartlett Tree Expert Co.,* 225 A.2d 288, 291 (Md. 1967));

"Restrictive covenants in employment contracts are in restraint of trade, and their validity depends on their reasonableness." *Premier Rides, Inc. v. Stepanian*, No. CV MJG-17-3443, 2018 WL 1035771, at *5 (D. Md. Feb. 23, 2018) (internal citation and quotations omitted). To assess the reasonableness of scope and duration, "a determination must be made based on the scope of each particular covenant itself; and, if that is not too broad on its face, the facts and circumstances of each case must be examined." 133 F. Supp. 3d at 774-75 (internal citations and quotation omitted); *see also id.* (determining that "an examination of the particular facts is not necessary because the clause is overly broad on its face"); *Millward v. Gerstung Int'l Sport Educ., Inc*., 302 A.2d 14, 16 (Md. 1973).

"Employers have a legally protected interest in preventing departing employees from taking with them the customer goodwill they helped to create for the employer." 116 F. App'x at 438. A restrictive covenant is not justified, however, "if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee." *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 335, 572 A.2d 510, 515 (1990) (internal quotations and citation omitted). When a restrictive covenant "is designed to suppress competition rather than protect the goodwill of the company, enforcement of the restrictive covenant violates public policy." *GetWell Network, Inc. v.*

ORDER – 6

1  *Grossman*, No. PWG-13-3624, 2014 WL 12908272, at *5 (D. Md. Apr. 29, 2014)

2        The 2014 Agreement contains a survival provision under which each restrictive

3  covenant—the non-competition, non-disclosure, and non-solicitation of employees—

4  constitutes a separate agreement that is severable from the Agreement. [2]  T-Dkt. # 112-24

5  ¶ 7.6.  Section 13 of the Agreement states that "the invalidity or unenforceability of any

6  provisions hereof shall in no way affect the validity of enforceability of any other

7  provision."  T-Dkt. # 112-24 ¶ 13.  The Court will therefore evaluate each covenant

8  individually.

9                    **i.      Non-Compete Provision**

10        The non-compete provision states that for a period of one year, an employee shall

11  not "own, manage, operate, join, control or participate in the ownership, management,

12  operation or control of a Competitor" nor "become a director, officer, employee,

13  consultant or lender of, or be compensated by, a Competitor."  T-Dkt. # 112-24 ¶ 7.1.

14  The term "Competitor" is defined as "any Person [individual or entity] which sells goods

15  or provides services which are directly competitive with those sold or provided by a

16  business that . . . is being conducted by Company at the relevant time and [] was being

17  conducted by Company at any time during the term."  *Id.* ¶ 7.5.  "Company" refers to

18  TCS "and its subsidiaries and affiliates."  *Id.*

19        In considering whether this language meets the four elements required for

20  enforceability, the Court finds that TCS has a legally protected interest in the goodwill

21  Ms. Houserman developed with clients as the president and vice president of a TCS

22  division.  The issue becomes murkier with respect to the second element: the

23

24  ───────────────
    [2] Plaintiff does not allege that Defendants violated the non-solicitation of employees.
25  Plaintiff alleges violations of the non-solicitation of clients, which is included within the
    "Competition" provision under Section 7.1 of the 2014 Agreement.  The clauses at issue
26  are not severable pursuant to the survival clause, but the Court will consider them
    individually before addressing permissible methods of resolution, such as blue penciling,
27  if they are found to be enforceable. T-Dkt. # 112-24 ¶ 7.1.

28  ORDER – 7

reasonability of the scope and duration of the restriction.  While the lack of geographic scope and one-year duration are reasonable under Maryland law, the unrestricted scope of prohibited activity raises questions.  *See PADCO Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 606 (D. Md. 2002) (upholding a two-year noncompete provision); s*ee Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 642 (D. Md. 1998) (holding that a lack of geographic limitation is not unreasonable where a business competes for clients on a national level).

Defendants assert that pursuant to the restrictive covenant, Ms. Houserman is precluded "from accepting *any* position at *any* company that had even a portion of business similar to Plaintiff's business."  T-Dkt. # 99 at 15.  They argue that because the restriction "is not limited to certain types of positions, to specific companies, or even to direct competitors," the provision is overbroad.  *Id.*  The covenant, they claim, is not narrowly tailored to protect the legal interests of TCS and is therefore invalid.  *Id.*  The Court notes that the 2014 Agreement does qualify "competitors" as those entities that sell goods or services that are "directly competitive" with the goods or services sold by TCS.  T-Dkt. # 112-7 at 5.  Nevertheless, the Court finds that this limiting language is insufficient and agrees that the non-compete provision is overly broad on its face.

TCS argues that language limiting employment to "direct competitors" is sufficient to render the covenant enforceable.  T-Dkt. # 119 at 11.  TCS relies on *Intelus Corp. v. Barton* for the proposition that the restriction to "direct" competitors was sufficient to uphold the enforceability of a non-compete provision.  7 F. Supp. 2d at 642.  But *Intelus* is distinguishable.  There, the Court was addressing the enforceability of a restrictive covenant's unlimited geographic reach and was determining the movant's likelihood of success for purposes of preliminary injunctive relief.  *Id.*  But more significantly, two decades have passed since *Intelus*, and the majority of courts presented with this issue since then have come out the other way.

Indeed, most courts applying Maryland law have found that non-compete

ORDER – 8

language barring all employment with competitors to be overly broad and unenforceable. The list is long.

For example, in *Deutsche Post Global Mail, Ltd. v. Conrad*, the Fourth Circuit held that the non-compete provision at issue was overbroad because it prohibited the plaintiffs from engaging "in in *any* activity which *may* affect adversely the interests of the Company or any Related Corporation and the businesses conducted by either of them." 116 F. App'x at 438 (emphasis original).  The Fourth Circuit explained that the covenant "does not stop at preventing [the plaintiffs] from competing against [their former employer], but rather prohibits them from doing anything that 'may affect adversely' the business interests" of their former employer or its related companies.  *Id.*

Similarly, in *Medispec, Ltd. V. Chouinard*, the court concluded that the restrictive covenant at issue was also overly broad:

> The clause here would prohibit Defendant from obtaining employment *in any capacity* for a presumably large number of medical device companies, even beyond those selling lithotripter devices, that indirectly compete with [Plaintiff]. The clause is not limited to preventing employment with [Plaintiff's] direct competitors. It also prevents Defendant from taking any job, no matter how unrelated to his prior sales work, with a company that indirectly competes with [Plaintiff] or its affiliates and subsidiaries.

133 F. Supp. 3d 771, 775 (D. Md. 2015) (emphasis in original).

Further, in *Bindagraphics, Inc. v. Fox Group, Inc*., the federal district court held that the preclusion of employment for a competitor in any capacity was overly broad. 377 F. Supp. 3d 565, 572 (D. Md. 2019).  The non-compete there prohibited an employee from becoming employed by an entity which "is engaged in the business of rendering, producing or selling trade binding, folding and/or finishing services, or other products or services identical or similar to any products or services now or hereafter rendered produced or sold by Employer through its trade binding division at any location within the Sales Territory."  *Id.* at 572.  The court held that the geographic scope and duration of

ORDER – 9

the covenant were reasonable but concluded that the absence of any restriction on prohibited types of employment was wider than reasonably necessary:

> The scope of this prohibition is not confined to sales positions or work akin to [Defendant's] duties on behalf of [Plaintiff]. Instead, it would prohibit [Defendant] from working in any capacity for a competitor that met the above criteria, even one unrelated to sales. As numerous courts in this district have held, the fact that Mr. Rodgers is prohibited from working in any capacity for a competitor renders the restriction wider than reasonably necessary to forestall the loss of customer goodwill.

> *Id.*

The court then cited a line of parallel cases applying Maryland law, in which courts reached the same conclusion. In *Paul v. ImpactOffice LLC*, federal district court concluded that a non-compete clause was wider than necessary and was not reasonably tailored to protect the employer's interest in preventing the loss of customer goodwill because "the scope of the proscribed activity is not limited to employment in positions similar to that which [the employee] held at Impact but instead would prohibit employment in any capacity at a competitor." No. CV TDC-16-2686, 2017 WL 2462492, at *4 (D. Md. June 6, 2017). In *Seneca One Finance, Inc. v. Bloshuk*, the district court held that the non-compete provision was unenforceable because it was "not limited to the work that [the employee] performed at Seneca One and [was] far wider in scope than is reasonably necessary to protect the goodwill that [the employee] may have created with Seneca One customers." 214 F. Supp. 3d 457, 461–62 (D. Md. 2016). In *MCS Services, Inc. v. Jones*, the court confirmed that the duration and scope of a noncompete were reasonable, but ultimately concluded that the provision was unenforceable because the "scope of the proscribed activity is not properly bounded." No. CIV.A WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010). The court explained its conclusion accordingly:

> Taken literally, the covenant would prevent Jones from working in any capacity for a competitor, even if his responsibilities were wholly unrelated to the business of high speed printer maintenance; it would even prevent him from working in

ORDER – 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Océ's mailroom. As a matter of law, therefore, the noncompetition provision is overbroad and unenforceable.

*Id.*

This line of cases maintains the original purpose of restrictive covenants as an acceptable restraint of trade as long as they are reasonable. *Premier Rides, Inc. v. Stepanian*, No. CV MJG-17-3443, 2018 WL 1035771, at *5 (D. Md. Feb. 23, 2018). Denying employees the opportunity to work for a competitor in a different capacity or field than that in which they created customer goodwill for the employer is no longer a defense of a legally protected interest. *See* 214 F. Supp. 3d at 461–62.

The language of Ms. Houserman's non-compete provision mirrors the language found to be overly broad in the cases above. Ms. Houserman cannot "own, manage, operate, join, control or participate in the ownership, management, operation or control of a Competitor" nor "become a director, officer, employee, consultant or lender of, or be compensated by, a Competitor." T-Dkt. # 112-24 ¶ 7.1. Indeed, Ms. Houserman is not merely precluded from competing directly against TCS but is barred from employment of any type at any company that sells any good or service that is directly competitive with a good or service sold by TCS, it subsidiaries, and it affiliates. TCS argues that Ms. Houserman's role with TCS as a senior executive who ran a business division warrants a broader non-compete based on her access to "extensive proprietary and confidential information." T-Dkt. # 119 at 11 (citing *Nat'l Instrument, LLC*, 2006 WL 2405831, at *5; *see also GetWell Network, Inc.*, 2014 WL 12908272, at *4; *Hekimian Labs.*, 664 F. Supp. at 498–99). The Court is unpersuaded.

Courts must initially consider the language of the restrictive covenant. If a restrictive covenant is "overly broad on its face," then "examination of the particular facts is not necessary." *Medispec*, 133 F. Supp. 3d at 775. Whether Ms. Houserman is a senior executive is not relevant to deciding whether a covenant is facially overbroad. *See e.g. Bindagraphics*, 377 F. Supp. 3d at 572. Even if the Court were to consider the facts,

ORDER – 11

however, the outcome would be unchanged.  Although Ms. Houserman worked as a senior executive in the specialized industry of 9-1-1 call handling and call routing, her non-compete does not restrict her employment activity only from this specialized field; instead it bars her from working in any field for any company that sells any good or service that competes with TCS.  This overly broad language would preclude Ms. Houserman from becoming a senior executive of any division within Motorola, including one that has nothing to do with the 9-1-1 call routing and handling business.  Under Maryland law, such a restriction on employment is wider than reasonably necessary to protect TCS's legally protected interest.

Nonetheless, TCS points to a handful of cases to support its argument that restricting the non-compete to employment with "direct competitors" renders the covenant enforceable.  The Court finds the cited case law to be tenuous, irrelevant, or simply out of line with the bevvy of cases described above.  For example, in *National Instrument, LLC v. Braithwaite*, a lower level state court in Maryland held that the geographic scope and duration of a non-compete provision were reasonable but failed to address the scope of restricted employment activity. No. 24-C-06-004840, 2006 WL 2405831, at *2 (Md. Cir. Ct. June 5, 2006).  In *GetWell Network, Inc. v. Grossman*, the covenant at issue explicitly restricted the former employee from providing services that were "similar to those [he] provided to the [employer]."  No. PWG-13-3624, 2014 WL 12908272, at *1 (D. Md. Apr. 29, 2014).  In *Hekimian Laboratories, Inc. v. Domain Systems, Inc*., a case decided by a Southern District of Florida court in 1987, the court addressed the likelihood of success for purposes of preliminary injunction and failed to consider the scope of activity barred.  664 F. Supp. 493, 499 (S.D. Fla. 1987).  Finally, in *Padco Advisors, Inc. v. Omdahl*, a court upheld the enforceability of a restrictive covenant because it was "carefully drafted" to restrict the defendant's employment with only two companies.  179 F. Supp. 2d 600, 607 (D. Md. 2002).

TCS argues that the covenant language is narrowly tailored, noting that Ms.

ORDER – 12

Houserman was prohibited from working for a "directly competitor" that (1) offers the same products or services that TCS offered (2) while Ms. Houserman was employed at TCS, and (3) during the pendency of her one-year non-compete.  T-Dkt. # 110 at 10-11. The Court disagrees.  This "tailored" language in no way restricts her prohibited activity at a competitor and is not reasonably necessary to protect the customer goodwill that Ms. Houserman created.  As the district court in *MCS Services* stated, "[i]t constrains the list of [her] potential employers instead of targeting possible goodwill-thieving activities." *MCS Services*, 2010 WL 3895380, at *3.  The Court thus finds the non-compete covenant to be overly broad and unenforceable.

The Court further concludes that it cannot "blue pencil," or excise language from, the non-compete to render it enforceable, as requested by TCS, because the provision is not "neatly severable."  *See Deutsche Post Glob. Mail, Ltd.,* 116 F. App'x at 439 ("A court can only blue pencil a restrictive covenant if the offending provision is neatly severable."); *Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 400 (D. Md. 2015) ("Maryland courts have excised restrictions that render a covenant overbroad only in circumstances in which the restrictions are contained in a separate clause or separate sentence.").  Although blue penciling is permissible to limit a covenant's reach to reasonable limits, a court may not rearrange or supplement language to the provision. *See Fowler v. Printers II, Inc*., 598 A.2d 794, 802 (Md. 1991).

Based on the Court's finding that the non-compete provision failed to address the scope of employment activity, the Court concludes that in the absence of supplemental language, the provision cannot be remedied.  TCS proposes modifying the covenant so that Ms. Houserman would only be prohibited from participating in the "management, operation or control of a Competitor."  T-Dkt. # 119 at 13.  But if, under the modified terms, Ms. Houserman were to accept a management role with a competitor for a division that was wholly unrelated to the 9-1-1 call routing or call handling business, TCS would no longer have a legally protected interest and the covenant would still be unreasonable.

ORDER – 13

The Court therefore concludes that the non-compete is wider than reasonably necessary and cannot be remedied by blue penciling.

### ii. Non-Solicitation of Clients

The 2014 Agreement bars Ms. Houserman from "solicit[ing] any client of Company on behalf of or for the benefit of a Competitor."[3]  T-Dkt. # 112-24 ¶ 7.1.  TCS asserts that Ms. Houserman violated her non-solicit through improper involvement with TCS clients, including South Dakota, Washington, and AT&T, during her employment with Motorola.  T-Dkt. # 111 at 14-15.  Defendants proffer the same arguments here as applied to the non-compete claim: (1) the non-solicitation covenant is unenforceable because it is overly broad; (2) it is invalid because it was superseded by the 2016 Agreement; and (3) TCS cannot demonstrate that the alleged breaches of contract caused TCS any damages.  T-Dkt. # 157 at 6.  Applying the same restrictive covenant analysis, the Court concludes that, like the non-compete provision, the non-solicitation provision is overly broad and thereby unenforceable.

TCS argues that the clause is enforceable because it is narrowly tailored to prohibit Ms. Houserman "from soliciting only those customers who were doing business with TCS *while she worked there*."  T-Dkt. # 119 at 14.  TCS argues that the cases relied on by Defendants address non-solicitation covenants that are more expansive than Ms. Houserman's because they include "future" or "potential" clients.  *Id.* (citing *Allied Fire Prot., Inc. v. Thai*, No. PWG-17-551, 2017 WL 4354802, at *8 (D. Md. Oct. 2, 2017); *Seneca One Finance, Inc.* v. *Bloshuk*, 214 F. Supp. 3d 464, 464 (D. Md. 2016).)  The Court agrees with Defendants that such cases are inapposite.  TCS argues and the Court recognizes that some Maryland courts have indeed enforced customer non-solicitation agreements that bar solicitation of all the employer's clients.  *See, e.g., Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md.1991) (upholding a non-solicitation clause prohibiting an

---

[3] While the non-solicitation of clients clause is in the non-compete provision, the Court finds the non-solicitation clause to be severable and will address its validity separately.

1    employee from soliciting any client of his former employer); *Tuttle v. Riggs-Warfield-*
2    *Roloson, Inc.*, 246 A.2d 588, 590 (Md. 1968) (holding that a non-solicitation covenant
3    barring solicitation of any of the former employer's clients for two years was "valid and
4    enforceable").

5           However, as a federal district court in Maryland noted, there has been a shift in the
6    law, as Maryland courts "have recently expressed concerns about the imposition of such
7    blanket restrictions on client solicitation." *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 292
8    F. Supp. 2d 748, 755 (D. Md. 2003), *aff'd on other grounds*, 116 F. App'x 435 (4th Cir.
9    2004).  Indeed, courts over the last two decades have been reluctant to enforce covenants
10   that restrict former employees from soliciting *all* clients of their former employers,
11   including those with whom they had no contact.  As the court in *Padco Advisors, Inc., v.*
12   *Omdahl* noted, "Maryland has looked with disfavor on [covenants] which restrict former
13   employees from dealing with all former clients."  179 F. Supp. 2d 600, 608 (D. Md.
14   2002).  The *Padco* court cited *Holloway v. Faw, Casson & Co.*, a Maryland Court of
15   Special Appeals case that found a covenant unreasonable because it "restrict[ed] [a
16   former employee] from engaging *any* former clients of the firm, regardless of whether
17   [the former employee] himself actually dealt with those clients during his employment
18   with [his former employer]."  572 A.2d 510, 515 (Md. Ct. Spec. App. 1990) (emphasis in
19   original).

20          Recent cases have followed suit.  In *Deutsche Post Global Mail, Ltd. v. Conrad*,
21   for example, a district court held, and the Fourth Circuit affirmed, that prohibiting a
22   former employee from soliciting all of the former employer's clients is overly restrictive
23   and unnecessary to protect the employer's interests.  116 F. App'x 435, 441 (4th Cir.
24   2004).  The district court in *Ameritox, Ltd. v. Savelich*, similarly concluded that a
25   customer non-solicitation covenant was too broad because it extended to two states where
26   the defendant had never provided services and thus had no clients.  92 F. Supp. 3d 389,
27   399 (D. Md. 2015).  The court found that such a covenant extended further than

28   ORDER – 15

necessary to protect the employer's interest in preventing the defendant from using the goodwill he created during his employment. *Id.*

Here, the non-solicitation covenant applies to all of TCS's clients. It is not limited to Ms. Houserman's clients while at TCS. It does not limit clients to the 9-1-1 call routing and call handling business. While it does not bar "future" or "potential" clients, it still imposes a blanket restriction on all clients of TCS. Barring Ms. Houserman from soliciting any of TCS's clients, even those that were not her clients and those that were engaged in different and unrelated businesses, creates an unnecessarily broad restraint on trade. The Court concludes that this covenant is wider than necessary to protect TCS's interest in preventing Ms. Houserman from taking the goodwill she created on behalf of TCS. As a matter of law, the Court finds that the customer non-solicitation covenant is facially overbroad and unenforceable.

TCS again requests that the Court blue pencil or limit application of the non-solicitation provision if the Court deems it overbroad. T-Dkt. # 119 at 14. And again, the Court finds it impossible to excise language to narrow the application of the non-solicitation restriction sufficiently to render it reasonable. As discussed above, the Court lacks authority to otherwise supplement or rearrange the language. Moreover, the Court declines to apply the covenant only to Ms. Houserman's clients, as requested by TCS, because this would be wholly inconsistent with the plain and unambiguous meaning of the covenant. *See Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539, 550 (D. Md. 2019) (noting that "where the language of the Nonsolicitation Provision is plain and unambiguous, the Court will presume the parties meant what they expressed").

### iii.   Confidentiality Provision

The confidentiality provision of the 2014 Agreement requires an employee to do the following:

> [A]t all time [to] hold in a fiduciary capacity for the benefit of Company all secret, confidential or proprietary information, knowledge or data relating to Company, and all of its businesses, which shall have been obtained by Employee during employment by Company and which shall not be or become public knowledge . . .

ORDER – 16

including, but not limited to, information regarding clients and agents of Company." T-Dkt. # 112-24 ¶ 7.2.

An employee must "return to Company all Confidential Information, including, but not limited to, any and all copies, reproductions, notes or extracts of Confidential information." *Id.* at 4.

### 1) Breadth of Confidentiality Provision

In its motion for summary judgment, TCS claims that Ms. Houserman violated this provision by retaining Comtech and TCS's confidential information and sharing it with Motorola. T-Dkt. # 111 at 14. In their motion, Ms. Houserman and Motorola argue that TCS's failure "to limit this information by time or to trade secrets" renders this provision overbroad and invalid. T-Dkt. # 99 at 18. Defendants contend that the Maryland Uniform Trade Secret Act ("MUTSA") "invalidates covenants barring the retention or use of confidential information unless the covenant is limited to the disclosure of *trade secrets*." *Id.* Before considering whether Ms. Houserman breached her confidentiality obligations, the Court will first consider whether the provision is enforceable.

MUTSA provides statutory remedies for the misappropriation of trade secrets. *MCS Servs., Inc. v. Jones*, No. CIV.A WMN-10-1042, 2010 WL 3895380, at *6 (D. Md. Oct. 1, 2010). "When dealing with trade secrets, [MUTSA] becomes the exclusive remedy for the misappropriation of trade secrets." *Paradyme Mgmt., Inc. v. Curto*, No. PWG-17-3867, 2018 WL 9989655, at *7 (D. Md. Jan. 17, 2018). The statute does not, however, affect "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." Md. Code Ann., Com. Law § 11-1207.

The highest court in Maryland has held that "[e]ven in the absence of trade secrets, under certain circumstances, a former employee may be enjoined from using confidential information obtained during the course of his employment." *Padco*, 179 F. Supp. 2d at

ORDER – 17

606 (citing *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 293 (Md. 1967)). Courts have found that when claims are based on proprietary or confidential information that does not constitute a trade secret as defined by MUTSA, the claims are not preempted by the MUTSA.  *See Philips N. Am. LLC v. Hayes*, No. CV ELH-20-1409, 2020 WL 5407796, at *11 (D. Md. Sept. 9, 2020) (finding that plaintiff's claims that defendant breached his employment contract and fiduciary duty by using "other confidential information . . . distinct from the trade secrets at issue under the MUTSA" were not preempted by MUTSA); *Structural Pres. Sys., LLC v. Andrews*, No. CIV.A. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) (holding that claims based on proprietary information that is not a MUTSA trade secret are not preempted by the MUTSA);  *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 802 (D. Md. 2002) (holding that MUTSA did not a preempt breach of duty confidential relationship claim because the confidential information at issue was not a "trade secret" under MUTSA).

While language restricting disclosure of a company's "ideas," "plans," or publicly available "marketing and sales methods" has been found to be vague and overly broad, Maryland courts have not squarely addressed whether the language at issue here is similarly unenforceable.  *See Ameritox*, 92 F.Supp. 3d at 401.  Here, Ms. Houserman's confidentiality obligations are limited to information, knowledge, or data relating to the company that are "secret, confidential, or proprietary" and are not and will not become publicly available.  T-Dkt. # 112-24 ¶ 7.2.  The Court does not find this to be overly broad or vague.

### 2)  2016 Agreement

The Court turns to Defendants' second argument on the validity of the restrictive covenants.  Defendants allege that the restrictive covenants in the 2014 Agreement were superseded by Ms. Houserman's and Comtech's 2016 Agreement.  T-Dkt. # 99 at 19. Having concluded that the non-compete and customer non-solicitation covenants are

ORDER – 18

facially overbroad and thereby unenforceable, the Court did not have to consider this argument with respect to those covenants. The Court now considers whether the confidentiality provision was superseded by the 2016 Agreement.

While the parties disagree on whether Washington or Maryland law governs this issue, the fact that there is no conflict between the laws of the states precludes the Court from engaging in a conflicts analysis. *See DC3 Entm't, LLC v. John Galt Entm't, Inc.*, 412 F. Supp. 2d 1125, 1138 (W.D. Wash. 2006) (noting that federal district courts apply "the choice-of-law rules of the state where the federal court sits . . . Washington courts will not engage in a conflicts analysis unless the party asserting the law of a foreign jurisdiction first shows that the law of that jurisdiction is fundamentally incompatible").

Here, both Maryland and Washington law require a showing that both parties intended to supersede a prior agreement when they entered into a new one. *See Higgins v. Stafford*, 165, 866 P.2d 31, 34 (Wash. 1994) (noting that "parties may abandon a community property agreement[] by mutually manifested intention clearly shown"); *I. W. Berman Properties v. Porter Bros.*, 344 A.2d 65, 70 (Md. 1975) ("A 'novation' is a new contractual relation made with intent to extinguish a contract already in existence."). In looking at evidence of mutual intent, a court must look at "the wording of the written agreements . . . and consider all the circumstances surrounding the transaction, including the subject matter and subsequent acts of the parties." 866 P.2d at 34 (Wash. 1994).

Ms. Houserman's 2016 offer letter discussed her compensation and bonus structure but did not address her 2014 Agreement or any restrictive covenants therein. T-Dkt. # 101-4. Because there is no language rescinding these covenants, the Court looks to the acts of the parties that indicate intent to replace the covenants with the 2016 Agreement. Ms. Houserman's undisputed acts indicate that she did not intend to have the 2016 Agreement supersede the 2014 agreement; indeed, she believed that it was still in effect when she went to work for Motorola in 2018. This is apparent when, on June 22, 2018, Ms. Houserman provided Motorola with the restrictive covenants within her 2014

ORDER – 19

Agreement and represented them as "the relevant pages of [her] employment agreement pertaining to the non-compete provisions." T-Dkt. 112-7 at 2-5. After joining Motorola, Ms. Houserman discussed her 2014 Agreement's non-compete restrictions as binding in an email on January 9, 2019. T-Dkt. # 112-37 at 2 ("I can't own NGCS because of my non-compete issues, so this is owned by my peer").

Moreover, as noted above, the 2014 contract contained a survival section under which each of the restrictive covenants "constitute separate agreements independently supported by good and adequate consideration and, notwithstanding anything in this Agreement to the contrary, shall be severable from the other provisions of, and shall survive, this Agreement." T-Dkt. # 112-7 ¶ 7. Even if there were evidence that the 2014 Agreement had been rescinded and replaced, the restrictive covenants would have survived as independent agreements. Based on the severability provision and evidence disproving the requisite intent for Ms. Houserman's 2016 offer letter to supersede the 2014 Agreement, the Court need not consider other elements for novation and finds that the confidentiality provision has not been superseded.

### 3) Breach of Confidentiality Provision

Defendants' final argument with the respect to the applicability of the restrictive covenants is that, even if they are enforceable, Ms. Houserman did not breach them. T-Dkt. # 99 at 22. Under Maryland law, the elements of a claim for breach of contract are "contractual obligation, breach, and damages." *Philips N. Am. LLC v. Hayes*, No. CV ELH-20-1409, 2020 WL 5407796, at *11 (D. Md. Sept. 9, 2020). Defendants claim that there is no evidence that Ms. Houserman "disclosed or used any confidential information about Plaintiff with respect to South Dakota, GDIT, or anything else, so there could have been no harm even if she had retained any information." *Id.* at 23. They also argue that Plaintiff is unable to "adequately identify damages Defendants caused" for this alleged breach, thereby entitling them to summary judgment. T-Dkt. # 99 at 13; T-Dkt. # 123 at 8-9.

ORDER – 20

Because Plaintiff will bear the burden of proof at trial for this claim, Defendants can prevail merely by pointing out to that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court finds that Defendants have not met their initial burden and Plaintiff has set forth specific facts demonstrating a genuine issue of fact.

TCS alleges that Ms. Houserman violated the confidentiality provision by failing to return or otherwise destroy TCS and Comtech confidential information and divulging confidential information. T-Dkt. # 111 at 14, 23. TCS alleges that Ms. Houserman "continues to possess a laptop full of Comtech and TCS proprietary information." *Id.* at 14. Some of the information, according to TCS, includes "detailed financial and forecast information and confidential information concerning clients for which Houserman worked at TCS and Comtech and for which she then worked at [Motorola], including GDIT and South Dakota." *Id.* at 23-24. TCS alleges that Ms. Houserman disclosed information about Comtech's methodology for calculating margins to Motorola's director of product. *Id.* at 24; T-Dkt. # 114-16 at 33-34. Ms. Houserman contends that she did not improperly share information in relation to Motorola's engagement with GDIT and South Dakota, and that the information she did share was "not competitive information." T-Dkt. # 114-16 at 34. These factual disputes surrounding Ms. Houserman's actions and whether they violated her confidentiality obligations are questions of both fact and law. The significant questions of fact preclude summary judgment in favor of Defendants.

With respect to Plaintiff's cross-motion for summary judgment, Plaintiff has the burden of proof at trial for this claim and must, therefore, affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Plaintiff does not meet its burden. The Court finds that Plaintiff has presented evidence in the form of testimony

ORDER – 21

and email correspondence between Ms. Houserman and her colleagues raising questions of material fact as noted above, but the evidence falls short of demonstrating that no reasonable factfinder could find for Defendants.  Evaluating Ms. Houserman's conduct and determining whether it violated the confidentiality provision requires a weighing of evidence by a jury.  The Court concludes that Plaintiff is not entitled to summary judgment on this claim.

### B.   Tortious Interference Claims

#### i.   Tortious Interference with the 2014 Agreement Against Motorola under Washington Law

TCS claims that "there is no factual dispute that [Motorola] tortiously interfered with TCS's agreement with Houserman."  T-Dkt. # 111 at 26.  A claim for tortious interference with a contractual relationship or business expectancy requires the following elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce Cty. Med. Bureau, Inc.*, 157, 930 P.2d 288, 300 (Wash. 1997).

As the Court has already concluded that the confidentiality provision is the only valid contractual provision between Ms. Houserman and TCS, the scope of analysis for this claim is limited to Ms. Houserman's confidentiality obligations.  *See supra* Section IV(A)(i)-(ii).  The Court has also determined that whether Ms. Houserman breached the provision is a question of fact for the jury.  Because the third element requires a showing of a breach, this claim cannot be resolved in favor of either party on summary judgment.

#### ii.   Tortious Interference with Contractual Relations Against Motorola and Ms. Houserman under Washington Law – South Dakota

Defendants claim they are entitled to summary judgment on the tortious interference with contractual relations claim related to South Dakota.  T-Dkt. # 99 at 10.

ORDER – 22

Because Plaintiff will bear the burden of proof at trial, Defendants need only to demonstrate that there is an absence of evidence to support the Plaintiff's case. *See Celotex Corp.*, 477 U.S. at 325.

In 2014, Plaintiff entered a five-year contract with South Dakota with an option to renew for an additional five years. T-Dkt. # 99 at 10; T-Dkt. # 101-7 at 5. In 2019, South Dakota did not renew its contract with Comtech and put out a public request for bids. *Id.* The parties dispute the reason for South Dakota's decision not to renew. T-Dkt. # 119 at 27; T-Dkt. # 123 at 9. TCS claims that Defendants tortiously interfered in its relationship with South Dakota, both before and after South Dakota had issued its request for proposals. T-Dkt. # 199 at 27. First, TCS claims that Defendants tortiously interfered because Ms. Houserman shared confidential information with her contacts at South Dakota regarding "Comtech's plans to downsize its call handling business and sunset the call handling product being used by South Dakota," which ultimately led to South Dakota's decision not to renew its contract with Comtech. *Id.* Second, TCS claims Defendants tortiously interfered because Ms. Houserman was "involved in strategizing [Motorola's] pitch" for the South Dakota contract "in clear violation of Houserman's non-compete." *Id.* Having concluded that Ms. Houserman's non-compete provision is unenforceable, the Court need not address the latter allegation surrounding Ms. Houserman's involvement in the bid.

In determining whether Defendants are entitled to summary judgment on this claim, the Court needs first to consider whether any evidence exists to support Plaintiff's claim that Ms. Houserman tortiously interfered by sharing confidential information with South Dakota. The Court finds no such evidence. Plaintiff's allegation is based solely on the vague and unsubstantiated statements of TCS's President and COO, Michael Porcelain. *See* T-Dkt. # 119 at 27. Mr. Porcelain claimed that "someone from South Dakota" told him during a meeting that they learned about Comtech's decision to get out of the call handling business from Ms. Houserman. T-Dkt. # 112-28 at 9. Mr. Porcelain

ORDER – 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

could not identify the individual who said that, and TCS did not provide testimony from any other individual who attended that meeting to confirm this statement or provide specific details. *Id.* Mr. Porcelain's statement follows a string of conclusory, vague allegations for which Plaintiff provides no substantiation:

> [Ms. Houserman] took all of the competitive information from Comtech that she had improperly. She used the information on her computer. She shared the information with people at Motorola including confidential pricing and other information related to South Dakota including the issues that South Dakota was having. She ultimately caused South Dakota to start communications with—with South Dakota [sic]. She had Motorola and others at Motorola specifically encourage South Dakota to go out and bid on a new . . . contract. And ultimately that's what happened.

T-Dkt. # 112-28 at 8-9.

In response to this claim, Defendants provide evidence directly contradicting Plaintiff's allegation that Ms. Houserman shared confidential information and that her alleged actions caused South Dakota not to renew its contract with Comtech. Defendants provide testimony from South Dakota 9-1-1 Coordination Board Members Shawnie Rechtenbaugh and Maria King who confirm that Ms. Houserman did not "do anything, either directly or indirectly, after she left Comtech that caused the State" not to renew its contract with Comtech. T-Dkt. # 101-7 at 24, 27. They confirmed the same with respect to Motorola. *Id.* Both Ms. Rechtenbaugh and Ms. King explained that South Dakota's decision was, instead, a direct result of Comtech's poor performance and perceived inability to meet the contract requirements. *See id.* at 23 (confirming that "Comtech's performance problems under the contract" were the reason why South Dakota choose to issue a new request for proposals); *see also id.* at 29 (agreeing that "not only was it because of the performance issues, it was because we didn't feel that they could meet the requirements of the contract by the end of the contractual term"). Indeed, Mr. Porcelain does not dispute Comtech's performance issues; he acknowledges "the problems and the defects and the issues in the call handling contract." T-Dkt. # 112-28 at 8. This acknowledgment undermines any business expectancy on the part of Comtech for South

Dakota to continue its contractual relationship with Comtech.

In the absence of any evidence supporting the first and third elements required in a tortious interference claim—the existence of a valid business expectancy and intentional interference induced or caused a termination of the relationship or expectancy—the burden shifts to Plaintiff to identify specific facts from which a fact finder could reasonably find in its favor.  *Celotex*, 477 U.S. at 324.  Plaintiff fails to identify such specific facts; Mr. Porcelain's conclusory and vague allegations are insufficient to meet Plaintiff's burden.  It is clear from the testimony of Ms. Rechtenbaugh, Ms. King, and Mr. Porcelain that Comtech had performed poorly and did not meet its contractual obligations.  Plaintiff identifies no facts in support of the existence of Comtech's valid business expectancy that South Dakota would renew its contract given these performance defects.  Mr. Porcelain's accusatory statements are unsupported by any evidence: (1) there is no evidence that Ms. Houserman shared confidential information about Comtech with South Dakota, and (2) there is no evidence that her actions, even if true as alleged, led South Dakota not to renew.  The Court therefore concludes that Defendants did not tortiously interfere with Plaintiff's contractual relationship or business expectancy with South Dakota as a matter of law.

### iii.   Tortious Interference with Business Expectancy Against Motorola and Ms. Houserman Under Washington Law – GDIT

Defendants argue that they are entitled to summary judgment on Plaintiff's claim that Ms. Houserman and Motorola tortiously interfered with Comtech's business expectancy with respect to GDIT.  T-Dkt. # 99 at 26.

Through her employment with Motorola, Ms. Houserman was responsible for negotiating with GDIT on behalf of Motorola to resolve an issue of liquidated damages related to multiple outages pursuant to Motorola's contract with GDIT.  T-Dkt. # 114-16 at 28-31.  Plaintiff alleges that when Ms. Houserman learned that Comtech was in negotiations to acquire GDIT, "she escalated her negotiations with GDIT and tied renewal of the GDIT-[Motorola] subcontract to resolving the liquidated damages dispute,

ORDER – 25

interfering with Comtech's acquisition of GDIT." T-Dkt. # 119 at 28. Plaintiff argues that Defendants engaged in conduct "that they knew would make Comtech's acquisition of GDIT more difficult." *Id.* Mr. Porcelain also alleged in his testimony that "Lynne interfered and tried to change pricing related to ongoing negotiations that Comtech and . . . the Commonwealth of Massachusetts were having." T-Dkt. # 101-10 at 5.

Beyond these broad accusations, Plaintiff fails to provide any specific facts as to how Ms. Houserman's conduct during negotiations on a liquidated damages matter between GDIT and Motorola was improper and caused interference in Comtech's acquisition of Motorola or its relationship with the Commonwealth of Massachusetts. *See* T-Dkt. 101-10 at 5. The Court need not delve into that, however, because Plaintiff's allegations are insufficient to establish a prima facie claim for tortious interference with business expectancy. They do not satisfy the third element of the claim, which requires a showing of "an intentional interference inducing or causing a breach or termination of the relationship or expectancy." *Moore v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 200 (Wash. Ct. App. 2012). Plaintiff has not alleged that Defendants' conduct induced or caused a *breach* or *termination* of relationship or expectancy because there was none. Plaintiff acquired GDIT as expected, and GDIT retained its business with Massachusetts as expected. T-Dkt. # 99 at 26. Because there is no dispute of facts with respect to this element, the claim fails as a matter of law and the Court grants summary judgment in Defendants' favor.

## V.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.** T-Dkt. # 99. Defendants' motion is granted with respect to the non-compete and client non-solicitation covenants of the breach of contract claim; the tortious interference with contractual relations claim against Motorola and Ms. Houserman; and the tortious interference with business expectancy claim against Motorola and Ms. Houserman. T-Dkt. # 99. Defendants' motion is denied with respect

ORDER – 26

to the confidentiality covenant of the breach of contract claim and the tortious interference in contractual relations claim against Motorola.   T-Dkt. # 99.  Plaintiff's motion for summary judgment is **DENIED**.  T-Dkt. # 111.

DATED this 3rd day of February, 2021.

The Honorable Richard A. Jones
United States District Judge

ORDER – 27